**CONDOR OPERATING COMPANY and its joint venturers et al., Plaintiffs-Appellees,**

v.

**John C. SAWHILL, Administrator, Federal Energy Administration, and Federal Energy Administration, Defendants-Appellants.**

**Nos. 5–10, 5–11.**

Temporary Emergency Court of Appeals of the United States.

Feb. 7, 1975.

Certiorari Denied May 19, 1975.

See 95 S.Ct. 1975.

William M. Kerr, Midland, Tex. (Ted M. Kerr and Kerr, FitzGerald & Kerr, Midland, Tex., with him on the brief) for plaintiffs-appellees.

Marvin L. Coan, Atty., Dept. of Justice, Washington, D. C. (Carla A. Hills, Asst. Atty. Gen., and Stanley D. Rose,

Atty., Dept. of Justice, with him on the brief) for defendants-appellants.

Before CHRISTENSEN, ESTES and JOHNSON, Judges.

CHRISTENSEN, Judge.

This case was initiated in the district court by a complaint praying for a temporary restraining order and preliminary and permanent injunctions to prevent enforcement by the Federal Energy Administration (FEA)[1] of a Remedial Order requiring Condor Operating Company and its joint venturers, plaintiffs-appellees herein (Condor), to sell certain crude oil production to Phillips Petroleum Corporation (Phillips).[2] It was alleged that the Remedial Order was invalid because Condor had not violated the provisions of section 211.63(a)[3] of Title 10, Code of Federal Regulations, upon which it was based and, if it had, that the regulation would have unconstitutionally deprived Condor of property without just compensation and without due process of law.

The trial court granted the preliminary injunction ordering defendants to refrain from interferring with Condor's taking its oil production in kind upon a determination that Condor was in compliance with § 211.63(a), concluded that the Remedial Order was invalid, and certified to this court the constitutional question[4] of whether the government

1. The Federal Energy Office became the Federal Energy Administration ("FEA") on June 27, 1974, pursuant to the Federal Energy Administration Act of 1974 (Pub.L. No. 93–159) and will be referred to herein as "FEA".

2. "Accordingly, FEA has concluded that a violation of 10 C.F.R. Section 211.63 has occurred. Therefore, pursuant to 10 C.F.R. Section 205.86(b), FEA is issuing this Remedial Order.

"The Condor Operating Company is hereby ordered to take the following remedial action: Condor shall supply Phillips with the volumes of crude oil Phillips was receiving under contract on December 1, 1973. This shall be interpreted to mean that any exercise by Condor of its contractual option to take in kind the volumes Phillips was purchasing on December 1, 1973, would not be effective to divert the flow of crude oil from Phillips under § 211.63."

3. "(a) All supplier/purchaser relationships in effect under contracts for sales, purchases, and exchanges of domestic crude oil on December 1, 1973, shall remain in effect for the duration of this program: provided, however, that (1) any such supplier/purchaser relationship may be terminated by the mutual consent of both parties; (2) the provisions of this paragraph do not apply to the first sale of crude oil pursuant to § 210.32 of this chapter [exempt "stripper well" oil]; and (3) the provisions of this paragraph shall not apply to the seller of any crude oil if the present purchaser of such crude oil refuses, after notice by the seller, to meet any bona fide offer made by another purchaser to buy such crude oil at a lawful price above the price paid by the present purchaser."

4. Pursuant to § 211(c) of the Economic Stabilization Act of 1970, as amended, 12 U.S.C.A.

was empowered to require an owner of property to sell its property to another private party, in view of Fifth Amendment protections.[5]

We stayed the injunction below pending our decision on the merits. It was also decided that in addition to the certified constitutional question all other matters presented to the district court in support of and in opposition to the application for preliminary injunction ripe for appellate review would be considered.[6] Contemporaneously the defendants filed notice of appeal from the district court's order granting the preliminary injunction.

## I. THE PROPRIETY OF OUR EXERCISE OF JURISDICTION BY VIRTUE OF THE CERTIFICATION.

The lower court granted the requested preliminary injunction upon its determination that a proper interpretation of the language of § 211.63(a) itself rendered the Remedial Order invalid. While the point has not been raised directly by any party, we have felt obliged sua sponte to inquire into our own jurisdiction and the propriety of its exercise. We were given pause by reference in Condor's reply brief to "the principle of judicial self restraint in avoiding constitutional issue holdings if the merits of the case can fairly be determined without doing so," and its suggestion that the constitutional issue can be so avoided here by upholding the lower court's decision on non-constitutional grounds.

The problem lies deeper, for if there were no substantial constitutional issue properly before the trial court in view of its complete resolution of the application for a preliminary injunction on non-constitutional grounds, it could be ques-

tioned under ordinary circumstances whether that issue should have been certified to us at that stage or that the non-constitutional issues should have been hung upon such a certification here. Cf. Shapp v. Simon, 510 F.2d 379 (Em. App.1975); National Petroleum Refiners Association v. Dunlop, 486 F.2d 1388 (Em.App.1973). See also District of Columbia v. Little, 339 U.S. 1, 70 S.Ct. 468, 94 L.Ed. 599 (1950).

The purported appeal by the defendants from the order in question does not ameliorate the problem. They had no appeal as of right from the interlocutory order; they had obtained from the district court no certification for the usual interlocutory appeal, nor had they filed application with this court for leave to so appeal within the time prescribed by § 211(d)(2) of the Economic Stabilization Act with reference to 28 U.S.C. § 1292(b). Thus our jurisdiction rests entirely upon special certification of the constitutional issue by virtue of § 211(c) of the Economic Stabilization Act, supra.

Nonetheless, we have concluded that the latter certification justifies our consideration not only of relevant non-constitutional problems but, to the extent that it thereafter remained significant, the constitutional issue as well. This conclusion has been reached by reason of the pendent nature of the non-constitutional issues, cf. Allee v. Medrano, 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974), the completeness of the record bearing upon all issues relating to the preliminary injunction, the likelihood that if avoided now they must come back to us later in the same case, because the interpretative questions are so enmeshed here with the constitutional issue as to make complete disposition in

§ 1904 (1974 Supp.), incorporated into the Emergency Petroleum Allocation Act of 1973, Pub.L. No. 93-159, 87 Stat. 627, by its § 5(a)(1).

5. The question was certified in the following language: "Whether the Congress of the United States, pursuant to the Emergency Petroleum Allocation Act of 1973, and the Federal Energy Administration and its Administrator, pursuant to Regulation 211.63 adopted under

the Act, have the power and right, under the Fifth Amendment to the Constitution of the United States, to require an owner of property, Condor Operating Company, to sell its property to another, Phillips Petroleum Corporation, for the benefit and to the financial advantage of Phillips."

6. § 211(c) of the Economic Stabilization Act, supra.

order, and the desirability for prompt resolution in light of circumstances hereinafter discussed. See Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); District of Columbia v. Little, 339 U.S. 1, 4 n.1, 70 S.Ct. 468, 94 L.Ed. 599 (1950), *supra*; In re Brown, 439 F.2d 47 (3d Cir. 1971); Board of Managers of Ark. Tr. Sch. for Boys v. George, 377 F.2d 228 (8th Cir.), cert. denied, 389 U.S. 845, 88 S.Ct. 105, 19 L.Ed.2d 114 (1967).

## II. THE CONFLICTING POSITIONS OF THE PARTIES.

Condor and its associated venturers are the owners of undivided interests in certain oil and gas leases in Ector County, Texas, with two other parties, one of which is Phillips. The operating agreement among them has provided since 1948 that the respective working interest owners shall have the right of taking in kind or selling to others their proportionate shares of the oil produced from the leases, a common provision in the industry. The operating agreement permits, but does not require, one working interest owner to sell its share of the production to another working interest owner, a situation Condor says is somewhat unique; most lease agreements, they say, are followed by purchase agreements between the producer and another purchaser, i. e., pipeline or refinery. In this case Phillips is a refiner. We do not see this as a differentiation significant here.

Over a period of many years and continuing until after December 1, 1973, Condor and its predecessors in interest sold their share of production to Phillips under Division Orders. See Thompson v. Thompson, 149 Tex. 632, 236 S.W.2d 779

(1951). Then determining that its profits would be higher if it refined its own crude oil, Condor began to take its production in kind, thus precipitating the present controversy.

The FEA, as part of its attempt to carry out the purposes of the Emergency Petroleum Allocation Act during the energy crises, promulgated the regulation in question, designed to prevent during the operation of the program, with limited exceptions not applicable here, the alteration of any supplier/purchaser relationship which existed on December 1, 1973, except upon the consent of both parties.[7] The Remedial Order was issued against Condor to prevent it from altering the disposition of its working interest and thus depriving Phillips of that source of supply.

Condor contends that it did not violate the regulation because in view of its right (option) to take its own crude oil production in kind it never had a binding agreement to sell it, Phillips had none to buy it, and at all times Condor has been entitled at its election to take its production in kind; that Phillips will continue to have available to it any crude oil which Condor may elect to sell rather than to utilize itself, and that if the Remedial Order should be held authorized by the regulation both would be unconstitutional because they would command a private citizen to make or produce and then sell private property to another private citizen in violation of due process rights guaranteed by the Fifth Amendment. It is insisted, nonetheless, that the trial court properly construed § 211.-63(a) as meaning that Condor is required to sell to Phillips only that crude oil which it would be willing to "sell" to

7. Prior to the express "freeze of relationships", FEA on January 14, 1974, issued petroleum allocation regulations (39 F.R. 1924, et seq., Jan. 15, 1974) which by § 211.64(a), provided subject to three exceptions that "all contracts for sales, purchases, and exchanges of domestic crude oil in effect on December 1, 1973, shall remain in effect for the duration of the mandatory allocation program." On January 28, 1974, FEA issued a clarifying amendment to this section making clear that it was the "suppler/purchaser relationships" that had to be maintained. (39 F.R. 3908, Jan. 30, 1974.) This section has not been materially changed since then, although as a result of the renumbering of sections which occurred in connection with subsequent amendments to other provisions of the regulations the December 1 rule is now contained in § 211.63(a).

someone, and that it has the continuing "consent" of Phillips under the option provided in the operating agreement to take all or any part of its crude oil in kind, to be refined and marketed as it has arranged to do.

Defendants-appellants contend here, as they did below, that the district court erred in determining that the plaintiffs could, under the operating agreement, exercise their contractual option and take their share of crude oil production in kind notwithstanding § 211.63(a); that the preexisting option conflicts with a legitimate exercise of federal regulatory powers; that the amendment of the regulation prior to any change in the supplier/purchaser relationship rendered clear beyond question that it was that relationship in effect under contracts for sales or purchases on December 1, 1973, rather than merely the foundational contracts which were to remain in effect for the duration of the program; that those relationships could not be altered simply by the exercise of options in existing contracts but required the consent of both parties after the December 1, 1973 freeze, and that plaintiffs are attempting improperly to gain the benefit of exemptions under subdivisions (1) and (3) of § 211.63(a) in the absence of requisite foundational circumstances.[8] The defendants-appellants contend finally that there is no substantial constitutional question.

A proper resolution of the issues requires more than fragmented consideration of the regulatory provision directly under attack.

## III. THE REGULATORY PLAN AND ITS FOUNDATIONS.

The FEA, then the Federal Energy Office as noted in the margin, was established by the President pursuant to Executive Order No. 11748 issued December 4, 1973. There was thereby delegated to the Administrator of FEA all the authority vested in the President by (1) the Emergency Petroleum Allocation Act of 1973 (Pub.L. No. 93–159); (2) Section 203(a)(3) of the Economic Stabilization Act of 1970, as amended (Pub.L. No. 92–210; Pub.L. No. 93–28); and (3) the Defense Production Act of 1950, as amended (50 U.S.C.App. § 2061 et seq.), as it related to the production, conservation, use, control, distribution and allocation of energy. The Chairman of the Cost of Living Council delegated further authority to the Administrator under the Economic Stabilization Act of 1970, as amended, in Cost of Living Council Order No. 47 (Dec. 26, 1973), and Cost of Living Council Order No. 47, Amendment 1 (Jan. 30, 1974).

Congress enacted the Emergency Petroleum Allocation Act of 1973, *supra* note 4, which became law November 27, 1973, in response to its findings that shortages of crude oil, residual fuel oil, and refined petroleum products existed or were imminent. These shortages were found to have created or be likely to create "severe economic dislocations and hardships",[9] which would "jeopardize the normal flow of commerce and constitute a national energy crisis which is a threat to the public health, safety, and welfare . . . ." Congress determined that the best method of averting or minimizing this national threat was to grant to the President of the United States "specific temporary authority" to deal with the shortages and dislocations of crude oil, residual fuel oil and refined petroleum products or dislocations in their national distribution system.[10]

8. ". . . (1) [A]ny . . . supplier/purchaser relationship may be terminated by the mutual consent of both parties . . . and (3) the provisions of this paragraph shall not apply to the seller of any crude oil if the present purchaser of such crude oil refuses, after notice by the seller, to meet any bona fide offer made by another purchaser to buy such crude oil at a lawful price above the price paid by the present purchaser."

9. These were stated to include "loss of jobs, closing of factories and businesses, reduction of crop plantings and harvesting, and curtailment of vital public services, including the transportation of food and other essential goods . . . ."

10. As stated by Congress, "The authority granted under this Act shall be exercised for the purpose of minimizing the adverse impacts of such shortages or dislocations on the American people and the domestic economy."

Section 4(b)(1) established within guidelines of the Act authority, indeed a mandate, for the President or his delegate to provide "to the maximum extent practicable" for

"(A) protection of public health, safety, and welfare . . . and the national defense;

. . . . .

"(D) preservation of an economically sound and competitive petroleum industry; including the priority needs to restore and foster competition in the producing, refining, distribution, marketing, and petrochemical sectors of such industry, and to preserve the competitive viability of independent refiners, small refiners, nonbranded independent marketers, and branded independent marketers;

"(E) the allocation of suitable types, grades, and quality of crude oil to refineries in the United States to permit such refineries to operate at full capacity;

"(F) equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry, including independent refiners, small refiners, nonbranded independent marketers, branded independent marketers, and among all users;

. . . . .

"(H) economic efficiency; and

"(I) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms."

Section 4(b)(2) of the Act directed the FEA to provide for use of a single date in computing the base prices of crude oil, residual fuel oil and refined petroleum products at all levels of marketing and distribution, and a dollar-for-dollar pass-through of net increased product cost to all marketers or distributors at the retail level. It was further provided in § 4(c)(1) that the mandatory allocation program for crude oil shall "[t]o the extent practicable and consistent with the objectives of subsections (b) and (d)" result in the allocation of crude oil to each small refiner and each independent refiner in an amount not less than the amount sold or otherwise supplied to such refiner during the corresponding period of 1972—adjusted to provide for the aggregate shortfall, if any, in total crude supplies over 1972 levels.

The record contains a summarization of the reasons FEA, after coordination with the Cost of Living Council and the oil policy group in the Treasury Department and consultation with major industry trade associations, concluded that it should maintain all supplier/purchaser relationships in effect on December 1, 1973: [11]

"a. The rule helped to maintain intact most of the pre-existing national distribution system for domestic crude oil, which was threatening to disintegrate during the last quarter of 1973. Since most domestic crude oil contracts were year-long contracts which would not terminate until after December 31, 1973, maintaining supplier/purchaser relationships as of December 1, 1973, would preserve and stabilize most of the nation's crude oil distribution system during a period when the potential for disorder was at its peak.

"b. The second major reason for the December 1 rule was that it established a floor upon which the crude oil allocation program (the 'buy-sell' list) could be built. The 'buy-sell' list depended upon each refiner being able to estimate its own crude oil availability for a three-month period. In order to make these estimates meaningful, it was necessary to stabilize as much of the existing crude flow as possible so that refiners would have a definite point of reference from which to

11. Affidavit of John Vernon, Associate Assistant Administrator for Fuels Management, Office of Operations, Regulations and Compliance of FEA.

measure the extent of their shortage. Without maintaining existing supplier/purchaser relationships, it would have been virtually impossible to make the estimates upon which the 'buy-sell' allocation program depended. Moreover, the December 1 rule enabled FEA to minimize the amount of crude oil that had to be allocated through forced sales under the buy-sell list by preventing crude supply imbalances among refiners from worsening during the critical start-up of the mandatory allocation program.

"c. The third principal reason for the December 1 rule was that it preserved access by independent and small refiners to price-controlled domestic crude oil. Without this rule, many small and independent refiners could have been supplanted or cut off by major integrated refiners. The December 1 rule was thus designed to meet the statutory objective of Section 4(b)(1)(F) to provide for 'equitable distribution of crude oil . . . at equitable prices among all . . . sectors of the petroleum industry, including independent refiners [and] small refiners. . . .' "

A recent case, Exxon Corp. v. Federal Energy Office, et al. 398 F.Supp. 865 (D.D.C. 1974), supplies warranted emphasis to related considerations, ignored in plaintiffs' arguments. The duty imposed upon a major supplier by the December 1/buy-sell regulations was attacked by a major supplier, which sought to avoid the requirements of selling to small and independent refiners 130,000 barrels of crude per day under the December 1 regulation or 95,000 barrels under the buy-sell regulation. An injunction against the enforcement of the regulations was denied by the district court, which observed, among other things:

" . . . The December 1 Regulation was implemented to continue supplier/purchaser relationships existing on December 1, 1974, [sic] within the whole petroleum industry and prevent a disruption in the existing distribution system for domestic crude oil. The December 1 Regulation, furthermore, was implemented to assure small and independent refiners continued access to lower-cost domestic crude oil. The December 1 Regulation, furthermore, was implemented to provide a foundation upon which a mandatory allocation program could be implemented by the FEA.

"The Buy/Sell Regulation provides for allocation of crude oil solely among refiners . . . to assure adequate supplies of crude oil for all refiners who were experiencing deficiencies of crude oil during that period of time. . . . The refiners who are eligible to purchase crude oil under the current Buy/Sell Regulation are only those refiners who fall within the definition of a small or independent refiner under Section 3 of the Petroleum Act."

See also Gulf Oil Corporation v. Simon, 502 F.2d 1154 (Em.App.1974).

The record indicates that the reasons for the program, of which the December 1 regulation is only a part, are continuing ones.[12] And there may be gathered from the allocation plan as a whole the rational bases both of the agency's denial of any controlling effect of options or other "consents antedating December 1, 1973" and the exception dealing with subsequent consents. It is reasonable to suppose that the latter do not threaten the program, controlled as they are by the continuing interest of major suppliers in maintaining their sources for meeting their own continuing obligations to independent or small refiners. Nor do we believe the regulation reasonably can be attacked here as one mandating production rather than regulating disposition, as Condor suggests. The subject of the Remedial Order was the disposition of produced oil as between the alternatives of sale to Phillips pursuant to the existing relationship, or taking in kind.

---

12. The basic Act initially was scheduled to expire February 28, 1975; this date has since been postponed to August 31, 1975. Pub.L. No. 93–511, 88 Stat. 1608 (Dec. 5, 1974).

## IV. THE REGULATION CONSTITUTES A RATIONAL EXERCISE OF DELEGATED POWERS.

██ We are of the view not only that Congress had the power to grant authority to the President and his delegates within the guidelines of the Act to pursue the objectives enumerated, but that the regulation in question, as a part of the entire plan, was a rational exercise of that power. "The national Government has the power to do what is needful for the great national purposes that identify this country's adjustments to change and ultimately survival." Amalgamated Meat Cutters & Butcher Work. v. Connally, 337 F.Supp. 737, 752 (D.D.C.1971). "We cannot, in these circumstances, conclude that Congress has given authority inadequate to achieve with reasonable effectiveness the purposes for which it has acted." Permian Basin Area Rate Cases, 390 U.S. 747, 777, 88 S.Ct. 1344, 1365, 20 L.Ed.2d 312 (1968).

██ Where the obvious intent of Congress is to give the President and his delegates broad power to do what reasonably is necessary to accomplish legitimate purposes rendered necessary by a recognized emergency, and regulations are fashioned to implement the Congressional mandate, the court should not interfere with the prerogative of the agency to select the remedy which for rational reasons is deemed most appropriate.

The urgency of the challenge confronting the agency upon the passage of the Emergency Petroleum Allocation Act already has been recognized. Reeves v. Simon, 507 F.2d 455 (Em.App.1974); People of State of California, State Lands Com'n v. Simon, 504 F.2d 430 (Em.App.1974); Mandel v. Simon, 493 F.2d 1239 (Em.App.1974).

Exercising of the administrative authority and the accomplishment of purposes enumerated by Congress under the recognized emergency conditions are exceedingly complicated undertakings. The petroleum industry itself is a complicated one. By reason of its intimate and convoluted relationship with the whole economy of the country it also tends to take upon itself the myriad problems besetting marketing and business activities generally. It would be the height of folly and grievously incompatible with the rule of deference, Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945); People of State of California, State Lands Com'n v. Simon, 504 F.2d 430 (Em.App.1974), supra;. Pacific Coast Meat Job. Ass'n, Inc. v. Cost of Living Coun., 481 F.2d 1388 (Em.App. 1973); University of Southern Cal. v. Cost of Living Council, 472 F.2d 1065 (Em.App.1972), cert. denied, 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973); Mandel and Reeves, supra, myopically to "solve" these problems solely on the basis of Condor's situation or by the court's off-hand ideas of regulatory alternatives differing from the rational approach set by the agency.

██ The party attacking a regulatory scheme must carry the burden of persuasion. Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944); American Nursing Home Ass'n v. Cost of Living Council, 497 F.2d 909 (Em.App. 1974). Neither the regulation nor the interpretation and enforcement of it as encompassed in the Remedial Order has been shown to be irrational, arbitrary, capricious or beyond the powers delegated. Consequently, accepting the interpretation of the agency, we reach the constitutional issue certified to this court.

## V. THE REGULATION AND THE REMEDIAL ORDER ARE NOT SHOWN TO BE UNCONSTITUTIONAL.

Plaintiffs say that historically " . . until January, 1974 the Congress, legislatures and those to whom they have delegated their functions, have confined their exercise of power over private property to the exercise of the power of eminent domain, and to solely negative influences in limiting, restricting, inhibiting or prohibiting the use or disposition

of private property." Plaintiffs see it as significantly different for " . . . Congress simply to come right out and tell the people what they positively must do with their property, rather than merely tell them what they cannot do with it." We find it unnecessary to discuss in detail the array of cases Condor has marshalled in an attempt to demonstrate that "affirmative" requirements beyond the reach of the power of eminent domain, unlike "negative" restrictions within the police power, are constitutionally unacceptable.[13]

Even though the distinction sought to be drawn between negative and affirmative requirements were not in the context of this case simply that, rather than representing some real difference, we think that Block v. Hirsh, 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865 (1921), is controlling against Condor's contention here. This case upheld the requirement of an emergency rental control measure that tenants be permitted to continue to occupy leased premises upon expiration of their leases and demonstrates that the affirmative requirement of a continued relationship for the benefit of another may be constitutionally acceptable even though property rights must be temporarily surrendered in the process, i. e., an interest in land for a substantial term. There, as in the present case, the complaining party was assured of compensation based upon administratively determined "reasonable" prices for the controlled property. Mr. Justice Holmes for the court faced and answered "[t]he main point against the law . . . that tenants are allowed to remain in possession at the same rent that they have been paying, unless modified by the Commission established by the Act, and that thus the use of the land and the right of the owner to do what he will with his own and to make what contracts he pleases are cut down." (256 U.S. at 157, 41 S.Ct. at 460.) Mr. Chief Justice Hughes later stated for the court in Home Building & Loan Ass'n v. Blaisdell, 290 U.S. 398, 440, 54 S.Ct. 231, 241, 78 L.Ed. 413 (1934), with reference to the doctrine of *Block*:

"Whatever doubt there may have been that the protective power of the state, its police power, may be exercised—without violating the true intent of the provisions of the Federal Constitution—in directly preventing the immediate and literal enforcement of contractual obligations by a temporary and conditional restraint, where vital public interests would otherwise suffer, was removed by our decisions relating to the enforcement of provisions of leases during a period of scarcity of housing. Block v. Hirsh, 256 U.S. 135 [41 S.Ct. 458, 65 L.Ed. 865]; Marcus Brown Holding Co. v. Feldman, 256 U.S. 170 [41 S.Ct. 465, 65 L.Ed. 877]; . . ."

Condor has attempted to distinguish *Block* from the present case but the dis-

---

**13.** We find them either not in point, superceded in application by the flow of modern authority, or not inconsistent in principle with the validity of the regulation. They range in dates from 1829 to 1937 and involve such matters as a requirement of a municipality that a railroad company permit use of its property for a public cab stand without compensation, the railroad's uncompensated furnishing of an underpass for a private individual, taxation for private purposes, the provision by a railroad company of siding tracks and services to private individuals without a preliminary hearing and without compensation, the similar requirement of weighing scales under specified circumstances, the issuance of private bonds for private donations, unreasonable railroad rates, the seizing of private property in Puerto Rico by a military governor in reliance upon claimed power in excess of that delegated to him by the President, building line regulations issued by a municipality by reason of a two-thirds vote of property owners in the area, the licensing of securities dealers which now contrary to the holding relied upon is generally regarded as constitutional, and cases recognizing that Fifth and Fourteenth Amendment rights to property include generally the right to acquire, use and dispose of it. Fallbrook Irrigation Dist. v. Bradley, 164 U.S. 112, 17 S.Ct. 56, 41 L.Ed. 369 (1896), another case cited, upheld levy of an assessment by an irrigation district with the statement, "It is obvious . . . that what is a public use frequently and largely depends upon the facts and circumstances surrounding the particular subject-matter in regard to which the character of the use is questioned."

tinction it seeks to draw rests upon misconceptions of both.[14] That *Block* has continued viability is indicated by frequent reference to it in the current cases, including quotation of a brief extract in Village of Belle Terre v. Boraas, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974). A decision most strongly relied upon by Condor during oral argument and referred to again in its supplemental statement, Railroad Retirement Board v. Alton R. Co., 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935), has been questioned as being at variance with the tenor of modern authority.[15] In any event, we do not regard it as in point. Far from *Block's* representing an aberrant application, its principle has been applied to a variety of analogous situations.

It has long been recognized that the Fifth Amendment prohibitions against the taking of property for public use without just compensation or due process of law refers only to direct appropriation and not to consequential injuries resulting from the exercise of lawful regulations. Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944), *supra;* Knox v. Lee, 12 Wall. 457, 79 U.S. 457, 20 L.Ed. 287 (1871); Western States Meat Packers Ass'n, Inc. v. Dunlop, 482 F.2d 1401 (Em.App.1973); Local Union No. 11, Int. Bro. of Electrical Wkrs. v. Boldt, 481 F.2d 1392 (Em. App.), cert. denied, 414 U.S. 1092, 94 S.Ct. 735, 38 L.Ed.2d 549 (1973); Wilson v. Brown, 137 F.2d 348 (Em.App.1943), *supra.*

A reasoned decision for the temporary suspension of usual ownership prerogatives based upon broad national needs does not constitute necessarily an unconstitutional taking; and the issue of whether it does properly turns upon the circumstances of each case. United States v. Central Eureka Mining Co., 357 U.S. 155, 78 S.Ct. 1097, 2 L.Ed.2d 1228 (1958). The regulation of future action based on rights previously acquired by the person regulated is not per se prohibited by the constitution. Fleming v. Rhodes, 331 U.S. 100, 67 S.Ct. 1140, 91 L.Ed. 1368 (1947). Reasonable and practical regulations which are generally fair and equitable, although not necessarily so as applied to a particular person, are not unconstitutional when general regulations are necessary to accomplish an appropriate congressional purpose. Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944), *supra;* Wilson v. Brown, 137 F.2d 348 (Em.App. 1943). Condor considers only its own situation. But agency orders are not to be read in a vacuum but rather must be interpreted in the entire context in

14. When during oral argument the court mentioned *Block,* not cited in the briefs, counsel asked for leave to file a response after study. They now have stated in such response among other things:

"We have no quarrel with the holding of *Block* because it is conceded in this case that if Plaintiffs wanted to and did sell their crude oil, they would, and could be required to, sell to Phillips, their traditional purchaser, at the FEA control price, just as the *Block* legislation required that if premises are to be rented they must be rented to the tenant in possession at the rent control rent, if the tenant wants to so rent it. Our quarrel is with the position that Plaintiffs must sell their crude oil even though they want to keep it and use it and not sell it to anyone."

In actuality the exception to the statute involved in *Block* was not based upon general "use" by the owner but only his possession "for actual and bona fide occupancy by himself, or his wife, children or dependents." All different use, or non-use, had to yield to a continuation of the relationship of landlord and tenant. In the present case Condor's desired "use" of its oil production is in no sense such a personal one, but involves processing by, and sale of the product to, others in the stream of commerce. Nor was *Block* narrowly decided with reference to the personal occupancy exception.

15. " . . . [W]e believe the cases cited by appellants are not controlling on the facts before us. See Mandeville Island Farms v. American C.S. Co., 1948, 334 U.S. 219, [230, 68 S.Ct. 996, 1003, 92 L.Ed. 1328,] where Mr. Justice Rutledge, speaking for the majority of the Court, listed the Alton case as one 'foredoomed to reversal', though the formal reversal has not yet taken place." Wicks v. Southern Pacific Co., 231 F.2d 130, 137, n.11 (9th Cir.), cert. denied, 351 U.S. 946, 76 S.Ct. 845, 100 L.E. 1471 (1956). See also Wickard v. Filburn, 317 U.S. 111, 121–122, 63 S.Ct. 82, 87 L.Ed. 122 (1942).

which they arise. Bell Telephone Company of Pennsylvania v. F.C.C., 503 F.2d 1250 (3d Cir. 1974).

The effect of invalidating the administrative action here would be far-reaching. The authority of the FEA, or its counterpart under any future stabilization plan, to cope with an energy crisis on the basis of a coordinated and balanced plan could be rendered questionable indeed. Essential powers of government to meet this or other crises in perilous times would be frustrated by the adoption of an excessively rigid and unprecedented construction inhospitable to broad realities. "A limit in time, to tide over a passing trouble, well may justify a law that could not be upheld as a permanent change." Block v. Hirsh, 256 U.S. 135, 157, 41 S.Ct. 458, 460, 65 L.Ed. 865 (1921), supra.[16] Whether the challenged regulation and enforcement order would pass muster as a long continuing response to chronic energy problems need not be decided. Nor may this opinion be interpreted out of context as passing on the validity or invalidity of other FEA regulations not directly involved here.

■ The wording of the question certified to this court assumed certain effects in disregard of the far more than counterbalancing considerations mentioned above. But having satisfied ourselves of the propriety of exercising jurisdiction based upon that certification of what essentially is a substantial constitutional question, we hold that the December 1 regulation was incorrectly interpreted by the district court, that there is no showing in the record that Condor's constitutional rights are violated by the Remedial Order, and that the district court erred in enjoining the enforcement of that order.

For the reasons indicated the order of preliminary injunction is reversed and the case is remanded to the trial court for further proceedings not inconsistent with this opinion.

---

**16.** Recently in similar vein the Supreme Court resolved far-reaching issues in the context of "[a] rail transportation crisis seriously threatening the national welfare . . . .", over the minority objection that while an "emergency often gives Congress the occasion to act. . . no emergency . . . permits it [Congress] to disregard the Just Compensation Clause of the Fifth Amendment . . . ." Regional Rail Reorganization Act Cases [Blanchette v. Connecticut General Ins. Corp.] 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).