**JAYMAR–RUBY, INC.**

v.

**FEDERAL TRADE COMMISSION and Michael N. Sohn, General Counsel, Federal Trade Commission.**

**No. S80–107.**

United States District Court, N. D. Indiana, South Bend Division.

Sept. 8, 1980.

---

James Bush, Charles Stewart, William Spangler, Sr., Merrilville, Ind., for plaintiff.

David Ready, U. S. Atty., South Bend, Ind., Patrick J. Quinlan, Providence, R. I., for defendants.

## MEMORANDUM AND ORDER

ALLEN SHARP, District Judge.

Jaymar brings this action under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202. Jaymar is an Indiana Corporation with its principal place of business in Michigan City, Indiana. To date, sixteen (16) states have intervened as Defendants, pursuant to Federal Rule of Civil Procedure 24.

This Court has jurisdiction over this proceeding, pursuant to 28 U.S.C. § 1331(a) dealing with a federal question in a suit against an agency of the United States. Venue is proper in this Judicial District, pursuant to 28 U.S.C. § 1391(e). Also, this is an actual controversy, definite and concrete, touching the legal relations of parties having adverse legal interests, which admit to specific relief through a decree of the Court. Further, the Court has had the assistance of extensive pleadings, briefs and a hearing on this matter and finds that a Declaratory Judgment will provide an expeditious and economical determination of the entire controversy.

## FACTUAL BACKGROUND

The Federal Trade Commission ("F.T.C.") is an administrative agency, created by the Federal Trade Commission Act ("The Act"), 15 U.S.C. §§ 41 et seq. (1976). The F.T.C. is authorized and directed by Section 5 of the Act, to prohibit unfair methods of competition and unfair or deceptive acts or practices, 15 U.S.C. § 45 (1976). To achieve this goal, it is empowered to gather and compile information; and investigate the organization, conduct, practices and management of corporations in or affecting commerce. It is also authorized to make public such information as it deems expedient in the public interest, and to make reports and recommendations for legislation to Congress. Id. § 46.

Under this statutory mandate, the F.T.C. initiated nonpublic investigation of the Advertising Checking Bureau, an organization which provides advertising services to its clients. Jaymar–Ruby, Inc., ("Jaymar") is a client of the Advertising Checking Bureau, which helps to market Jaymar's product. Pursuant to this investigation, the F.T.C. initiated an investigation of Jaymar and certain of its affiliates. On June 13, 1978, the Commission issued a subpoena duces tecum, requiring Jaymar to furnish the F.T.C. documents relating to its marketing, distribution and pricing practices. Jaymar submitted documents consisting of internal correspondence and memoranda,

sales and financial statistics, a sales manual and other documents. Some of these documents reveal the names and addresses of customers, marketing strategies, product allocation programs, and cost and profit data. It is these later items that Jaymar contends are trade secrets in the highly competitive clothing industry, and seeks to prevent their disclosure to the requesting State Attorneys General.

The Commission investigation of Jaymar ended in November, 1979 with the issuance of a Commission Complaint and a Consent Order, requiring Jaymar to cease and desist from certain acts, practices and methods of competition. The Order enjoined Jaymar from fixing, establishing, or otherwise controlling or maintaining the resale prices at which retailers sell its products and from taking steps to enforce such prices through the surveillance of retailers, threatened withholding of advertising allowances, or terminating dealers.

Beginning in September, 1979, the F.T.C. received requests from numerous State Attorneys General for access to the Commission's investigative files on Jaymar. These requests commenced under Section 6(f) of the Act, 15 U.S.C. § 46(f), and the policy enunciated by the F.T.C. of cooperation with state law enforcement agencies. 16 C.F.R. §§ 4.6, 4.11(a)(2). Jaymar then initiated its effort to keep portions of these files closed by requesting a grant of confidentiality from the F.T.C. for certain documents. Their underlying fear being that the release of this information to the State Attorneys General will subject it to disclosure to competitors under the Freedom of Information Act (the F.O.I.A.). Jaymar contends that this would allow competitors to obtain these claimed "trade secrets" from the State Attorneys General, thus gaining advance knowledge of Jaymar's marketing plans and strategies, giving them a competitive advantage. The Court recognizes these as legitimate concerns in the market place but the question of disclosure by the State Attorneys General is not before the Court. In response to Jaymar's request, the Commission issued a letter by its General Counsel, Michael N. Sohn, dated November 27, 1979, stating that the requesting State Attorneys General would be granted access to the files under a caveat of confidentiality. Jaymar opposed this release and initiated further negotiations with the F.T.C. in regard to the proposed release. After at least half a dozen letters and phone calls and three conferences, the Commission notified Jaymar by letter dated April 14, 1980 that it had determined not to alter its decision to release the files to the requesting State Attorneys General. Such a release would be limited to those State Attorneys General willing to sign a commitment to maintain the confidentiality of the file. The letter concluded that in light of the undertaking of confidentiality to be signed, the "release of the Jaymar files to these requesters . . . will not jeopardize the commercial sensitivity and value of the materials to the company. . . .". This letter constituted the final agency action.

On April 24, 1980 Jaymar filed this action, alleging that the decision to release the documents to the state requesters violates Section 6(f) of the F.T.C. Act, the Federal Trade Secrets Act, 18 U.S.C. § 1905, the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), the Fifth Amendment to the United States Constitution and that it is entitled to the return of its documents.

## MERITS

In light of the passage of the Federal Trade Commission Improvements Act of 1980 (the "Improvements Act"), which amended Section 6(f) of the old Act, the threshold inquiry must be what statute applies. Prior to Amendment, Section 6(f) of the Act, 15 U.S.C. § 46(f) read as follows:

Publication of Information; reports (f) To make public from time to time such portions of the information obtained by it hereunder, except trade secrets and names of customers, as it shall deem expedient in the public interest; and to make annual and special reports to the Congress and to submit therewith recommendations for additional legislation; and to provide for the publication of its

reports and decisions in such form and manner as may be best adapted for public information and use.

Then, on May 28, 1980, the President signed into law the Improvements Act, which amended Section 6(f) as follows:

### DISCLOSURE of COMMERCIAL or FINANCIAL INFORMATION

#### Quarterly Financial Reports

Sec. 3. (a) Section 6(f) of the Federal Trade Commission Act (15 U.S.C. 46(f)) is amended:

(1) by striking out "except trade secrets and names of customers, as it shall deem expedient" and inserting in lieu thereof "as are", and

(2) by inserting before the period at the end thereof the following: "Provided, that the Commission shall not have any authority to make public any trade secret or any commercial or financial information which is obtained from any person and which is privileged or confidential, except that the Commission may disclose such information to officers and employees of appropriate Federal law enforcement agencies or to any officer or employee of any State law enforcement agency upon the prior certification of an officer of any such Federal or State law enforcement agency that such information will be maintained in confidence and will be used only for official law enforcement purposes".

Section 14 of the Improvements Act adds a new Section 21 to the FTC Act. New Section 21 provides in pertinent part:

"(f) Any material which is received by the Commission in any investigation, a purpose of which is to determine whether any person may have violated any provision of the laws administered by the Commission, and which is provided pursuant to any compulsory process under this Act or which is provided voluntarily in place of such compulsory process shall be exempt from disclosure under Section 552 of Title 5, United States Code (the FOIA)."

The Conference Report on the Improvements Act discusses the purpose of these two amendments:

"The conference substitute adopts the Senate amendment but specifies that any material received by the Commission in any investigation, to determine whether any person may have violated any provision of the laws administered by the Commission, and provided pursuant to compulsory process under this Act, * *, shall be exempt from disclosure under the Freedom of Information Act.

.     .     .     .     .

The Conference substitute has also amended the prohibitions on disclosure in Sections 3 and 15 of the Senate bill to *permit the Commission to continue sharing information* with Federal, as well as State, law enforcement agencies for official law enforcement use *if the agency certifies that such information will be maintained in confidence.* This change is made to assure effective coordination within the Government and to eliminate needlessly duplicative information requests to private persons. A 'law enforcement agency' is an agency that has the legal authority to engage in activities 'for official law enforcement purposes.' The phrase law enforcement purposes, in turn, has the same meaning as it does in Exemption 7 of the Freedom of Information Act.

That is, the Commission is permitted to provide documents to another agency, even if public disclosure were otherwise prohibited, if the agency requests the material in connection with any criminal, civil or administrative proceeding, or any investigation potentially resulting in such a proceeding. See House Report No. 1497, 89th Cong.2d Sess. 11 (1966)." U.S. Code Cong. & Admin.News 1980, pp. ———, ———.

(126 Cong.Rec.H. 3158 (daily ed.) May 1, 1980; emphasis supplied.)

Thus, the Conference Report confirms that the effect of the Improvements Act is: (1) to affirm the Congressional purpose that

the Commission be permitted to "continue sharing information with * * * State law enforcement agencies"; and (2) to remove the possibility that sensitive material obtained pursuant to subpoena (as were the Jaymar documents at issue here) would be released under the FOIA or otherwise "made public".

Senator Ford of Kentucky, Chairman of the Conference Committee, and one of the principal authors of the new Act stated:

"It has been noted that the conference report permits the FTC to disclose confidential information to Federal and State law enforcement agencies if the agencies agree to maintain the material in confidence and if they need the information for official law enforcement purposes. The provision maintains an authority which the Commission has under current law, as recently explained by the Court in the Interco case. The Conference report *does not require the Commission to second–guess or look behind the scope of a State Attorney General's request* for access to the Commission's investigatory files.

As to information that the Commission obtained before enactment of this bill, *the respective prohibitions and authorities contained in Sections 6(f), 21(d), 21(3), [21(e)], and 21(f) apply regardless of whether the information was obtained before or after the effective date of the act.* Sections 21(a), 21(b), and 21(c) apply to material obtained by the Commission after the effective date of the act."

(126 Cong.Rec. S 5678 (daily ed.) May 21, 1980; emphasis supplied.)

Jaymar contends essentially that the old Section 6(f) applies, that the FTC has no authority to release its documents under that Section, that it submitted the documents prior to the effective date of the Improvements Act, and that its substantive claim of confidentiality had "vested" under the old Act.

■ Central to these arguments is the point that statutes operate only prospectively in the absence of clear legislative intent to the contrary. *Hasset v. Welch,*

303 U.S. 303, 58 S.Ct. 559, 82 L.Ed. 858 (1938). Since Jaymar submitted the documents while the old Act was in effect, they should be governed by it. However, this argument misconstrues the question. The statutory amendment under consideration governs disclosures of information by the F.T.C., not the submission of documents.

Section 23 of the Improvements Act provides that "the provisions of this Act, and the amendments made by this Act, shall take effect on the date of the enactment of this Act." When taken with Senator Ford's previously quoted remark, it is clear that the new Act is not retroactive at all; it governs disclosures occurring after its effective date. Under the old Act, the extent of the Commission's authority to release information to State law enforcement officials was at best unclear. In the only two cases litigated, the F.T.C. was allowed to disclose its files to the State Attorneys General. *Interco, Inc. v. F. T. C.,* 478 F.Supp. 103 (D.D.C.1979), appeal dismissed No. 79–1423 (D.C.Cir.1980); *Martin Marietta Corp. v. F. T. C.,* 475 F.Supp. 338, 344 (D.D.C. 1979), affirmed as modified (D.C.Cir. May 27, 1980). However, it was precisely this litigation that the Improvements Act aimed at. Congressman Preyer stated that the Congress wanted to put an end to suits which tie up State law enforcement investigations unnecessarily. Comm.Mem. at 34. Each State's statute of limitations is running on these matters, so time becomes of the essence. While each State could discover much of this information on its own, the public interest in the expeditious resolution of judicial proceedings would not be served by requiring duplicative discovery efforts. Otherwise, it would be possible for a recalcitrant business to tie up its documents through this type of litigation with the intent of letting the State statute of limitations run. However, this observation is not intended to cast any aspersions upon Jaymar's good faith in the matter before the Court.

■ Consequently, the Court finds that the Improvements Act does apply to documents which were collected before its effec-

tive date, which the F.T.C. seeks to disclose after its effective date. Further, the Improvements Act authorizes the disclosure of these documents to the requesting State Attorneys General, provided the statutory requirements of confidentiality are complied with. Nor will the Trade Secrets Act, 18 U.S.C. § 1905, bar this disclosure. Under both the old and new statute, the Act provides the authorization of law that precludes the application of Section 1905. *Martin Marietta Corp. v. F. T. C., supra* at 344.

Having recognized the F.T.C.'s basic authority to make this disclosure, the question then becomes whether its exercise is reviewable by the Court; and if so, what is the standard of review. The Improvements Act provides that the Commission "may disclose such information" to law enforcement agencies. F.T.C. Improvements Act of 1980, Section 3(a)(2). Jaymar contends that this discretion is subject to review under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), and that the decision of the FTC to release all of Jaymar's documents was an arbitrary and capricious abuse of that discretion. The F.T.C. claims that its action is non–reviewable, as the decision is within the discretionary function exemption of the Administrative Procedure Act, 5 U.S.C. § 701(a)(2).

Whether agency action is reviewable poses a difficult question of congressional intent. The Court must decide if Congress has, in either express or implied terms, precluded judicial review by committing the challenged action entirely to administrative discretion. *Dunlop v. Bachowski,* 421 U.S. 560, 567, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377 (1975); *Barlow v. Collins,* 397 U.S. 159, 165, 90 S.Ct. 832, 837, 25 L.Ed.2d 192 (1970). The discretionary function exemption, while narrow, separates those actions of executive and independent regulatory agencies that the Courts may scrutinize, under the legal standards in 5 U.S.C. §§ 701–706, from those that are subject to exclusive legislative oversight. Jaymar contends that the four factors set forth in *Citizens to Preserve Overton Park v. Volpe,*

401 U.S. 402, 417–423, 91 S.Ct. 814, 824–827, 28 L.Ed.2d 136 (1971) must be considered in the context of review, under the Administrative Procedure Act. However, Jaymar's application of the language from *Overton Park* is mechanistic and does not focus on the nature of the administrative action involved here. Its application here is inconsistent with the Court's analysis in *Overton Park,* and other decisions explaining when agency action involves unreviewable discretion; e. g., *Southern Ry. v. Seaboard Allied Mining Corp.,* 442 U.S. 444, 454, 99 S.Ct. 2388, 2394, 60 L.Ed.2d 1017 (1979); *Morris v. Gressette,* 432 U.S. 491, 501, 97 S.Ct. 2411, 2418, 53 L.Ed.2d 506 (1977); *Ass'n of Data Processing Serv. Organizations v. Camp,* 397 U.S. 150, 157, 90 S.Ct. 827, 831, 25 L.Ed.2d 184 (1970).

Some Courts have employed a pragmatic analysis in determining whether a discretionary agency determination is the proper subject of judicial review. See, e. g., *Natural Resources Defense Council, Inc. v. SEC,* 606 F.2d 1031, 1043–1044 (D.C.Cir.1979); *Greater N. Y. Hosp. Ass'n v. Mathews,* 536 F.2d 494, 498 (2d Cir. 1970). In the absence of a clear indication of congressional purpose, these Courts have focused on three factors: (1) the appropriateness of the issues raised for review by the Courts; (2) the impact of review on the effectiveness of the agency in carrying out its assigned role; and (3) the need for judicial supervision to safeguard the interest of the plaintiffs. See Saferstein, *Nonreviewability: A Functional Analysis of "Committed to Agency Discretion,"* 82 Harv.L.Rev. 367, 371 (1968).

Consideration of these facts in the present context strongly supports nonreviewability. Review would undermine the effective and orderly conduct of State investigations by inviting companies to engage in disruptive and dilatory litigation of ancillary procedural issues in the Courts.

Review of the Commission's decision would clearly undercut the legislative interest behind the Improvements Act. Congressman Preyer eloquently describes the purpose of amending Section 6(f) as avoiding litigation (Comm.Mem. 34), not spawn-

ing new cases on whether the Commission has properly exercised its discretion.

■ Congress has plainly decided what the Commission should take into account in responding to requests for information by State Attorneys General: "prior certification . . . that such information will be maintained in confidence and will be used only for official law enforcement purposes." Further, it is clear that the State Attorneys General are in a better position than the Commission or the Courts to determine, in the context of pertinent state laws, which specific documents in the files are relevant to their investigations. Nor is there any requirement in the statute that consideration be given to the other factors Jaymar seeks to interject. In short, the necessary clear and convincing evidence that Congress meant to prohibit judicial review of the Commission's limited decision to release documents to State law enforcement agencies is provided by the language of the statute, its place within the statutory design, and its legislative history. Therefore, the decision to disclose the Jaymar files is a nonreviewable discretionary function, exempt under the Administrative Procedure Act, 5 U.S.C. § 701(a)(2).

Jaymar next argues that sharing information with a State law enforcement agency, even one which has committed to keep such information confidential, nonetheless constitutes a "taking" of property for a public use without just compensation. Merely providing the information to a State law enforcement agency would not "destroy" Jaymar's "trade secrets" any more than would providing the information to the Commission in the first place. Thus, Jaymar's argument depends on its assumption that because the material is provided to State Attorneys General under Section 6(f) of the FTC Act, the Commission will be required to release Jaymar's confidential information to its competitors under the FOIA. However, the Improvements Act provides for a blanket FOIA exemption for documents provided to the Commission pursuant to subpoena, and forbids the Commission to make public confidential financial or commercial information. Federal Trade Commission Improvements Act of 1980, Section 14(f). The exemption applies to documents in the possession of the Commission on the effective date of the Improvements Act. Thus Congress has effectively foreclosed the major "risk" which Jaymar purports to fear.

Nor can Jaymar assume that the States will make public the information which they receive in violation of the agreements of confidentiality which they have signed. Such an assumption violates the presumption of regularity which attaches to government agreements.

Thus while Courts have held that as a matter of law, it cannot be presumed that private persons will honor commitments not to disclose information (*Sears, Roebuck & Co. v. EEOC*, 581 F.2d 941, 946–47 (D.C.Cir. 1978)), Courts do presume that government officials will honor similar commitments. See, e. g., *Exxon Corp. v. FTC*, 589 F.2d 582, 586 n.4, 589 (D.C.Cir.1978), cert. denied, 441 U.S. 943, 99 S.Ct. 2160, 60 L.Ed.2d 1044 (1970); *Ashland Oil, Inc. v. FTC*, 548 F.2d 977, 979 (D.C.Cir.1976).

■ Moreover, the notion that the mere "risk" of public disclosure or disclosure to competitors transforms the compelled submission of confidential information into a "taking" of property within the Fifth Amendment if untenable. The D. C. Circuit has recently held that no taking occurs even when the Commission discloses trade secrets to Congress (which executed no confidentiality agreement), and that holding applies a fortiori to submissions of trade secret information to a State law enforcement agency where (as here) there is a commitment by the State not to release the information to third parties. *Exxon Corp. v. FTC, supra*, 589 F.2d at 589; see also *Pharmaceutical Mfrs. Ass'n. v. Weinberger*, 401 F.Supp. 444, 448–49 (D.D.C. 1975). Moreover, the Supreme Court and other courts have consistently declined to treat the exposure of a risk of taking or destruction incidental to otherwise lawful government action or regulation as a prohibited "taking" for Fifth Amendment pur-

846

poses. See e. g., *Penn Cent. Transp. v. New York*, 438 U.S. 104, 124–28, 98 S.Ct. 2646, 2659–2662, 57 L.Ed.2d 631 (1978); *Bowles v. Willingham*, 321 U.S. 503, 517–18, 64 S.Ct. 641, 648–49, 88 L.Ed. 892 (1944); *Knox v. Lee*, 79 U.S. (12 Wall.) 457, 551–52, 20 L.Ed. 287 (1871); *Condor Operating Co. v. Sawhill*, 514 F.2d 351, 361 (Em.App.), cert. denied, 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1976). In the unlikely event that an improper disclosure were to occur and result in competitive injury, it would amount at most to a "collateral consequence" of the Commission's cooperation in the State's investigation for which no Fifth Amendment protection would apply. *Odessky v. FTC*, 471 F.Supp. 1267 (D.D.C.1979); see also *Hannah v. Larche*, 363 U.S. 420, 443, 80 S.Ct. 1502, 1515, 4 L.Ed.2d 1307 (1960); cf. *Hurtado v. United States*, 410 U.S. 578, 588–89, 93 S.Ct. 1157, 1163–64, 35 L.Ed.2d 508 (1973) ("no matter how financially burdensome" the obligation to provide evidence in legal proceedings is not a "taking" within the meaning of the Fifth Amendment).

■ Assuming, arguendo, that an improper public disclosure of documents lawfully obtained in an investigation might be considered a "taking" in violation of the Fifth Amendment, such a violation would take place only when the public disclosure occurred and not earlier. Until then, it cannot be ascertained whether any significant property interest still inheres in the particular information, nor whether the disclosure is injurious.

Therefore, the Court finds there has been no violation of Jaymar's Fifth Amendment rights.

In a claim for relief, only tangentially related to the complaint (the disclosure of the documents to the State Attorneys General), plaintiff claims that because "the Commission has accomplished the purpose for which it subpoenaed the documents," it has no right to continue in possession of the documents. Jaymar's claim is founded on the assertion that "plaintiff's records are of no continuing value to the Commission and are not needed as evidence of the Commission's functions or operation" and is allegedly supported by cases requiring return of documents subpoenaed by grand juries and construing the term "agency records" under the FOIA. But plaintiff is in error, for its claim represents a fundamental misconception of the role of the Commission and the purposes which Congress intends it to serve. The fundamental error is the assumption that once the particular law enforcement investigation in which the documents have been subpoenaed is terminated, the documents may not be utilized for other purposes.

Section 9 of the FTC Act, 15 U.S.C. § 49 authorizes the Commission "to require by subpoena the attendance and testimony of witnesses and the production of all documentary evidence relating to any matter under investigation." Section 6(b) of the FTC Act, 15 U.S.C. § 46(b), further authorizes the Commission:

"To require, by general or special orders, persons, partnerships, and corporations * * * to file with the Commission in such form as the Commission may prescribe annual or special; or both annual and special, reports or answers in writing to specific questions, furnishing to the Commission such information as it may require as to the organization, business, conduct, practices, management, and relation to other corporations, partnerships and individuals of the respective persons, partnerships, and corporations filing such reports or answers in writing."

■ The Commission's broad information-gathering authority frequently has been recognized and sanctioned by the Courts. The ability to retain and make general use of the information acquired is a corollary of the Commission's broad information-gathering authority.

The very objective of administrative agencies, after all, is that they will gain and make effective use of expertise in their regulatory and law enforcement missions—in the Commission's case, *inter alia*, the prevention of unfair methods of competition and unfair or deceptive trade practices (15 U.S.C. § 45) and enforcement of the Clayton Act (15 U.S.C. § 21). Access to a

broad range of data regarding particular industries and individual companies is especially important in assessing antitrust matters. See *Ash Grove Cement Co. v. FTC,* 577 F.2d 1368, 1376 (9th Cir.), cert. denied, 439 U.S. 982, 99 S.Ct. 571, 58 L.Ed.2d 653 (1978).

■ Nothing in the FTC Act suggests that, counter to this clear policy, information acquired by the Commission should be returned when the particular matter concerning which it was acquired is closed, or that such information should not be accessible to Commission attorneys or economists working on matters to which those materials might be relevant. Accordingly, it has been the Commission's consistent practice through the years to retain and make general law enforcement use of information obtained through compulsory process under Section 6(b) and 9 of the FTC Act.

The Courts have upheld the Commission's authority to use for any purpose information which it has lawfully obtained for a specific purpose. In *United States v. Morton Salt Co.,* 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950), the Court stated that:

> "(W)e find nothing that would deny . . . use (of information gathered, pursuant to the Commission's information–gathering authority) for any purpose within the duties of the Commission, including a 5 (adjudicative) proceeding. A construction of such an Act that would allow information to be obtained for only a part of the Commission's functions and would require the Commission to pursue the rest of its duties as if the information did not exist, would be unusual to say the least." (338 U.S. at 649–650, 70 S.Ct. at 367.)

*Morton Salt* is consistent with other cases recognizing that agencies may properly use information which has been lawfully obtained for one purpose for other law enforcement purposes. See *Donaldson v. U. S.,* 400 U.S. 517, 532–533, 91 S.Ct. 534, 543, 27 L.Ed.2d 580 (1971); *United States v. Morgan Guaranty Trust Co.,* 572 F.2d 36 (2d Cir.), cert. denied, 439 U.S. 822, 99 S.Ct. 89, 58 L.Ed.2d 114 (1978).

Finally we note that the FOIA cases on which plaintiff relies turn on the question of when an agency has sufficient possession and control over a document to make it an "agency record" within the meaning of that statute. Where, as here, the Commission plainly has possession of the documents, the cases have no applicability.

In light of the foregoing, it is hereby ORDERED that this Court's previous Order maintaining the status quo, is dissolved.

So ordered.