MAPCO INC. and Thomas A. Manhart, **Appellants-Plaintiffs,**

v.

**Jimmy CARTER, President, James R. Schlesinger, Secretary of Energy, and Department of Energy, Appellees-Defendants.**

No. 10–13.

Temporary Emergency Court of Appeals.

Argued Nov. 18, 1977.

Decided March 14, 1978.

As Amended March 27, 1978.

Certiorari Denied June 19, 1978.
See 98 S.Ct. 3090.

Frederic Dorwart, Holliman, Langholz, Runnels & Dorwart, Tulsa, Okl. with whom David W. Holden and J. Michael Medina, Tulsa, Okl., of the same firm, and Duke R.

Ligon and John H. Buck of Bracewell & Patterson, Washington, D. C., were on the brief for the plaintiffs-appellants.

John N. Hanson, Dept. of Justice, Washington, D. C., with whom Barbara Allen Babcock, Asst. Atty. Gen., and Dennis G. Linder, Washington, D. C., were on the brief for the defendants-appellees.

Before CHRISTENSEN, BECKER and REGAN, Judges.

BECKER, Judge:

In December 1975, this action was filed by plaintiff Mapco Inc. against Gerald R. Ford, then President of the United States (President), The Federal Energy Administration (FEA), and Frank G. Zarb, then Administrator of the FEA (Administrator). In March 1976, Thomas A. Manhart (Manhart) was permitted to intervene in the action as plaintiff. Pursuant to Rule 25(d), F.R.Civ.P., the District Court substituted in their official capacities Jimmy Carter, successor to Gerald R. Ford, as President, and John F. O'Leary, successor to Frank G. Zarb, as Administrator.

As of October 1, 1977, pursuant to the Department of Energy Organization Act, (DOE Act), P.L. 95–91, 91 Stat. 565, 42 U.S.C. § 7101, et seq., and Executive Order 12009 (42 F.R. 46267), FEA and its functions were transferred to the Department of Energy (DOE) of which James R. Schlesinger is Secretary. Pursuant to Rule 43(c), F.R.A.P., DOE and James R. Schlesinger are hereby substituted as appellees and defendants for FEA and Administrator O'Leary.

Since this action was certified to this Court, rather than appealed, the parties will be referred to as plaintiffs and defendants. Cf. *Griffin v. United States* (Em.App.1976) 537 F.2d 1130, l.c. 1133.

It is admitted that plaintiff Mapco Inc. is a Delaware corporation, with its principal place of business in the Northern District of Oklahoma, engaged in the business of pro-

ducing and selling crude oil to refineries and other purchasers in the States of Oklahoma, Utah, Kansas, and Wyoming; that intervening plaintiff Manhart is a citizen of Oklahoma, residing in the Northern District thereof, and engaged in the business of exploring for and developing reserves of crude oil, extracting and marketing such crude oil to refineries and other purchasers in Oklahoma and other parts of the United States (Defendants' Br. 2).

In this action, plaintiffs sought to enjoin the defendants from implementing and enforcing the provisions of Section 401(a) adding new Section 8(a) of the Energy Policy and Conservation Act of 1975 (Energy Policy Act), P.L. 94–163, 89 Stat. 871, 42 U.S.C. § 6201, et seq., and 15 U.S.C. § 751, et seq., to the Emergency Petroleum Allocation Act of 1973 (Allocation Act),[1] P.L. 93–159, 87 Stat. 628, 15 U.S.C. § 751, et seq. The Energy Policy Act amended the Allocation Act and the Energy Conservation and Production Act (Energy Act), P.L. 94–385, 90 Stat. 1125, 42 U.S.C. § 6801, et seq.

Section 401(a) of the Energy Policy Act, attacked by the plaintiffs, is found in Part A, Title IV thereof. As stated above, Section 401(a) added to the Allocation Act as a new Section 8(a), among others. Section 8(a) is codified as 15 U.S.C. § 757. Although plaintiffs refer to 15 U.S.C. § 757 as § 401(a), and the District Court and defendants refer to it as Section 8(a) of the Allocation Act, for clarity we will refer to the challenged legislation as 15 U.S.C. § 757, or as § 757, except in quoted material.

In January 1976, counsel for the defendants filed a motion to dismiss for Gerald R. Ford, then President of the United States, on the grounds (1) that he is not subject to the jurisdiction of the district court, and (2) that he is not a necessary party to the action (R. 29).

Plaintiff Mapco propounded first written interrogatories to the defendants in January 1976 (R. 19) which were answered by

---

1. The "Act" in *Consumers Union of U. S., Inc. v. Sawhill,* Em.App., 525 F.2d 1068, at page 1071.

the defendants (R. 50). Thereafter, in February 1976, plaintiff Mapco propounded to the defendants second written interrogatories (R. 81) which were answered in April 1976 by the defendants (R. 106), who treated some of the interrogatories as requests for admissions under Rule 36 of the Federal Rules of Civil Procedure.

On June 2, 1976, plaintiffs filed a motion for summary judgment supported by affidavits. In July 1976, defendants moved to strike (R. 180) parts of the supporting affidavits of Robert E. Thomas (R. 130) and T. A. Manhart (R. 132), and Exhibit B to the affidavits of Burnet Vance Davis (R. 135), Lawrence J. Gitman (R. 147), and David A. Huettner (R. 162), on the grounds that they contained opinions, conclusions, argument, speculation, and were objectionable because they contained irrelevant, immaterial, and inadmissible evidence. Defendants thereby recorded their legal contention that the challenged portions of these affidavits did not state "facts established" because "defendants have submitted no controverting evidence" as contended by plaintiffs (Plaintiffs' Br. 2).

On May 10, 1976, the defendants filed a motion for dismissal or, in the alternative, for summary judgment. (The motion of plaintiffs for summary judgment and of defendants for dismissal or, in the alternative, for summary judgment, and briefs in support thereof were not included in the Record on Appeal. Copies were supplied at the request of this Court.)

*Certification by the District Court of Constitutional Questions to the Temporary Emergency Court of Appeals*

In September 1977, before the determination of any of the pending motions, the district court entered an Order certifying constitutional questions to the Temporary Emergency Court of Appeals.

In that Order the following was recited:
"The Court finds that this litigation raises substantial constitutional questions, in that plaintiffs contend that Section 8(a) is constitutionally infirm under the Fifth Amendment because, on its face, it does not provide a nonconfiscatory standard for regulating the price of domestically produced crude oil; and because, as applied it confiscates plaintiffs' property without just compensation and due process of law. Plaintiffs also contend that Section 8(a) violates the Ninth Amendment right to trust the Federal Government and rely on the integrity of its pronouncements. Accordingly, plaintiffs ask the Court to enjoin the implementation and enforcement of Section 8(a) of the Allocation Act.

"Section 211(c) of the Economic Stabilization Act of 1970, found in 12 U.S.C. § 1904 (Note) provides:
'In any action commenced under this title in any district court of the United States in which *the court determines that a substantial constitutional issue exists,* the *court shall* certify such issue to the Temporary Emergency Court of Appeals. Upon such certification, the Temporary Emergency Court of Appeals shall determine the appropriate manner of disposition which may include a determination that the entire action be sent to it for consideration or it may, on the issues certified, give binding instructions and remand the action to the certifying court for further disposition.' (Emphasis supplied)
"Section 211(c) of the Economic Stabilization Act, has been incorporated in Section 5(a)(1) of the Allocation Act, 15 U.S.C. § 754(e)[a](1), as amended by Section 452 by the EPCA, and controls the jurisdiction of this Court to decide the constitutional questions raised by the plaintiffs in this action.

"This Court hereby certifies all constitutional issues raised by the parties in their pleadings and memoranda filed in this Court to the Temporary Emergency Court of Appeals for appropriate disposition. *National Petroleum Refiners Association v. Dunlop,* 486 F.2d 1388 (TECA 1973)" (R. 210–211).

*Exclusive Jurisdiction of Temporary Emergency Court of Appeals*

■ The provisions of P.L. 92–210, December 22, 1971, amending § 211(c) of the

Economic Stabilization Act of 1970 (Stabilization Act), August 15, 1970, 12 U.S.C. § 1904, Note, creating the Temporary Emergency Court of Appeals, and providing for its exclusive jurisdiction have been preserved despite the expiration of the Stabilization Act on April 30, 1974, through subsequent legislation, including the recent DOE Act, P.L. 95–91, Title V, § 502, the applicable earlier § 5(a) of the Allocation Act, and §§ 461, 523(b), and 401(8h) of the Energy Policy Act. By virtue of the foregoing statutory authorities, exclusive jurisdiction to determine the constitutional questions certified in this action is vested in this Court.

### Issues Presented

Plaintiffs contend that the issues presented for review are:

1. Whether 15 U.S.C. § 757 (referred to as Section 401(a) by plaintiffs) of the Energy Act violated the Ninth Amendment right to trust the federal government and rely on the integrity of its pronouncements.

2. Whether 15 U.S.C. § 757 of the Energy Act is unconstitutional because it fails to provide a non-confiscatory standard for price regulation.

3. Whether 15 U.S.C. § 757 of the Energy Act is unconstitutional because there is no real and substantial relation between the price rollback mandated by § 401(a) and any proper legislative purpose (Plaintiffs' Br., unnumbered page 1).

According to the defendants, the issues presented, in inverse order, are:

1. Whether the Allocation Act, · as amended by the Energy Act, on its face, violates the Fifth Amendment by failing to provide proper standards for regulating the prices of domestically produced crude oil.

2. Whether the application of 15 U.S.C. § 757 (referred to as Section 8(a) by the defendants) of the amended Allocation Act to the plaintiffs violates the Fifth Amendment.

3. Whether the Ninth Amendment prohibits the implementation and enforcement of 15 U.S.C. § 757 of the amended Allocation Act (Defendants' Br. 15).

These issues will be discussed and decided in the order presented by the plaintiffs.

### THE NINTH AMENDMENT QUESTION

#### Plaintiffs' Ninth Amendment Argument

An understanding of plaintiffs' novel Ninth Amendment contention requires a preliminary review of the "two-tier" price regulations held valid in *Consumers Union of U. S., Inc. v. Sawhill* (Em.App.1975) 525 F.2d 1068. These regulations, and the "two-tier" pricing system for "old oil" and "new and released oil" adopted thereby, are concisely described in the following quotation (footnotes omitted) from the majority opinion in that case, at pages 1074 to 1077, inclusive, as follows:

"The regulations at issue adopted, essentially unchanged, the so-called 'two-tier' price system originally implemented by CLC as part of its Economic Stabilization Program. As both parties agree, 'old' oil—oil from properties producing at, or less than, their 1972 production level— is subject to the 'ceiling price rule,' and accounts for approximately 60 percent of domestic crude production. Although accounting for approximately 13 percent of domestic crude production, stripper wells, those producing less than ten barrels per day, are specifically exempt from allocation and price controls. 15 U.S.C. § 753(e)(2). FEA's regulation of the remaining oil, 'new' and 'released,' which account for 16 and 11 percent respectively of domestic crude production, is at the heart of this dispute.

"The price of both new and released crude oil is determined pursuant to the 'special release rule.' Thus, new crude oil, equal to the amount of domestic crude produced and sold from a property in a specific month above the amount produced and sold from that property during a base month in 1972, may be sold without regard to the ceiling price, *i. e.,* at the market price. If a particular property did not produce at all in 1972, the base year, then all of its current production is

new oil and accordingly, may be sold at the market price.

"For released oil the special release rule presents a more complicated situation. Where a property is now producing in excess of its 1972 production level, that oil produced up to the 1972 level is released oil; of course, the excess is new oil. The maximum allowable price for released oil is the lesser of the current market price or the price derived pursuant to a formula established by the special release rule. The formula engenders a price for released oil that is a function of the base period production level, the May 15, 1973 posted price, the current market price, and the amount by which current production exceeds base period production. The result is that when a producer's revenues from a sale of new and released oil from a particular property are averaged, the *weighted average price* may be well below the current market price. Most importantly, FEA's analysis of the formula at work vividly illustrates its inherent production incentive."

Relying on the regulations upheld in *Consumers Union of the U.S., Inc. v. Sawhill, supra,* the plaintiffs, in their original brief, described their Ninth Amendment contentions in the following language:

"The fundamental and announced purpose of the two-tier crude oil price system was to induce investment in domestic exploration as well as the investment in the development and use of high-cost enhanced recovery methods for depleted or marginal wells. Consistent with the intent of those who devised it, the two-tier crude oil price system operated as an intricate administrative mechanism which—through the favored treatment of new oil coupled with the released oil device—sought to induce and did induce the plaintiffs and others to invest large sums of capital in exploration for new reserves and in secondary recovery of existing reserves.

"The means of inducement was the prospect of world market prices for the favored categories of new and released oil, a prospect which has now been de-stroyed by the Energy (Policy) Act. At the time of promulgation of the two-tier crude oil price system, the government represented that the purpose of the two-tier crude oil price system was to provide an incentive to induce investment in domestic exploration and investment in the development and use of high-cost enhanced recovery methods for depleted or marginal wells.

"In reliance on the two-tier crude oil price system and the representation of the defendants as to the purpose of adoption of the two-tier crude oil price system, and in reliance on expressed exhortations of the defendants addressed to the plaintiffs and to other crude oil producers, calling upon them to increase their drilling and development activities, the plaintiff Mapco from August, 1973, to December 22, 1975, expended in excess of $43,800,000.00 directly attributable to the exploration for and development of reserves of crude oil, and the plaintiff Manhart expended $28,000.00." (Plaintiffs' Br. 6–7).

In support of their contention that 15 U.S.C. § 757 violates the plaintiffs' right under the Ninth Amendment to trust the Federal Government and to rely on the integrity of its pronouncements, plaintiffs assert that the crude oil price "rollback" mandated by 15 U.S.C. § 757 violated the plaintiffs' "right to trust the federal government and to rely on the integrity of its pronouncements." This contention is argued at great length with copious and unrestrained citations to federal and state cases, law review articles, the Federalist Papers, other sources of constitutional history, and the challenged affidavits filed in the district court (Plaintiffs' Br. 9–30). On this one point alone, plaintiffs cite 142 different authorities, including 50 cases, none of which supports plaintiffs' contention.

In this section of plaintiffs' brief, in an attempt to bring its general and multifarious Ninth Amendment contentions within relevant bounds, plaintiffs summarize their Ninth Amendment contentions in a discus-

sion of the five proposed relevant questions claimed to be involved in determining the validity of § 757:

"1. Whether the new rule represents an abrupt departure from a well-established practice or merely an attempt to fill a void in an unsettled area of law.

"2. Whether the party against whom the new law applies relied on the former law.

"3. Whether retroactive application of the statute imposes a burden.

"4. Whether the government has demonstrated a compelling governmental interest to support the infringement.

"5. Whether a less restrictive alternative exists" (Plaintiffs' Br. 25, *et seq.*).

Plaintiffs' reply brief is much more revealing than the generalities of their original brief. Their reply brief on the Ninth Amendment issue states, among other things, the following:

"The defendants misconceive the entire thrust of the plaintiff's [sic] complaint. The plaintiffs' contention is that the ninth amendment right to trust the government and rely on the integrity of its pronouncements has been violated, *not by the imposition of price controls, but by the retroactive rollback of prices* (note omitted). It is the retroactive application of the price rollback mandated by the Energy Act that breaches the right of trust. The power of the government to impose price controls over new oil, or even to lower new oil prices prospectively is not presently challenged. The plaintiffs challenge the *retroactive application* of the crude oil price rollback to include oil that was discovered as a result of investments made pursuant to intentional inducement by the government. Nothing that the defendants have asserted casts the slightest doubt on this essential point" [note omitted] (Plaintiffs' Reply Br. 5–6).

*Defendants' Ninth Amendment Argument*

Defendants' answer to the Ninth Amendment contention is in four parts.

First, defendants assert that plaintiffs have not demonstrated that the defendants in the Executive branch have "pronounced, stated or otherwise promised" that the price of upper-tier crude oil would remain at the market level set by the OPEC cartel; that the fact that the purpose of favored treatment for upper-tier oil was to provide additional economic incentive for the production of such oil does not mean that the defendants or Congress at any time warranted that such favored treatment (1) would always continue, and (2) if so, at OPEC prices; that there is nothing in the statute, its regulations, or defendants' statements or actions which support such an alleged promise; that while plaintiffs state that § 757 abrogates the two-tier system and destroys the possibility of favored treatment for upper-tier oil, § 757 retains both the two-tier system and favored treatment for upper-tier oil, citing *Griffin v. United States* (Em. App.1976), 537 F.2d 1130, l.c. 1139, fn. 26.

Second, defendants argue that, prior to the Energy Policy Act amendments to the Allocation Act, prices for new and released oil were not uncontrolled free market prices, but were prices which the Federal Energy Administration controlled but permitted to rise to market level, citing recognition and approval of this action by the Temporary Emergency Court of Appeals, *en banc*, in *Consumers Union of U.S., Inc. v. Sawhill* (Em.App.1975), 525 F.2d 1068, l.c. 1077–1079. Defendants state that if plaintiffs were in fact induced to make capital investments because they thought new and released domestic crude oil prices were not being controlled, the inducement resulted from plaintiffs' misunderstanding of the law.

Third, defendants argue that if plaintiffs were induced to make capital investments because they expected new and released domestic crude oil prices would be allowed to remain at market levels, that inducement also resulted from their own misunderstanding of the law, citing *People of the State of California v. Simon* (Em.App.1974), 504 F.2d 430, *cert. den.*, 419 U.S. 1021, 95 S.Ct. 496, 42 L.Ed.2d 294.

In this connection, defendants contend that estoppel cannot be employed to prohibit a federal officer or agency from taking action found to be necessary in the public interest. *Loftus v. Mason*, (C.A.4), 240 F.2d 428, l.c. 435.

Fourth, defendants note that the challenged two-tier pricing system with its fixed upper-tier price ceiling is a product of the legislative branch of the government which defendants were required to follow, while the earlier two-tier pricing system was a product of the Executive branch of the government which did not impose the current challenged controls. Further, defendants argue that even assuming the plaintiffs had a right to expect continued market level prices for new and released domestic crude oil, federal regulation of future action of a right previously acquired is not prohibited by the Constitution. Further, defendants argue that if a Ninth Amendment right to expect continued market level prices for new and released crude oil exists, it is subject to proper federal regulation, citing *United Public Workers v. Mitchell*, 330 U.S. 75, l.c. 94–104, 67 S.Ct. 556, 91 L.Ed. 754.

### Purpose and Effect of the Addition in 1975 of § 757 to the Allocation Act

The Energy Policy Act, enacting the new § 757 and adding it to the Allocation Act, became effective December 15, 1975. The crude oil price controls under the Allocation Act of 1973 existing before December 15, 1975, and the purpose and effect of new § 757 are described in the following excerpts from House Report No. 94–340 accompanying H.R. 7014 containing the original draft of § 757:

"*Existing Price Controls*

"The Emergency Petroleum Allocation Act of 1973, was enacted in November, 1973, against a background of severe shortage of crude oil and its products. The principal aims of the Act were to meet the nation's priority petroleum needs, to distribute the remaining available products equitably, and at equitable prices, and to accomplish these objectives in ways that would preserve the competitive viability of the independent segments of the industry. At the time the Allocation Act was passed, price control authority over the petroleum industry and the rest of the economy as well was lodged in the Cost of Living Council which had discretionary price and allocation authority under the terms of the Economic Stabilization Act of 1970. Upon enactment of the Allocation Act, the newly-created Federal Energy Office (now the Federal Energy Administration) assumed responsibility for petroleum pricing and allocation.

"The Economic Stabilization Act has since expired and the Allocation Act today constitutes the only Federal authority for the control of petroleum prices. The current price regulatory system finds it roots in the regulations prescribed by the Cost of Living Council in August, 1973, during the so-called 'Phase IV' sector-by-sector approach to economic controls. These regulations provided (and their successor regulations still provide) for classification of domestically produced crude oil into 'old' and 'new' designations.

"Current regulations, thus, establish a 'two-tier pricing system' which imposes a price ceiling on that classification of crude oil which is denominated as 'old oil' while allowing other classifications to sell at the market. Under the existing regulation, old oil (that is, oil from properties producing at, or less than, their 1972 production levels) is controlled at the price which prevailed in the field on May 15, 1973, plus an additional $1.35 per barrel. This formula results in a national average price for such oil of about $5.25 per barrel.

"At present, 'old oil' constitutes approximately 66 percent of domestic production or 5.6 million barrels a day. According to April field-price postings, the remaining 33 percent of domestic production which is not price-regulated sold at market prices of almost $12.00 per barrel. Imported crude oil, also not price-regulated, sold for a landed cost of $12.63 per barrel in January of this year. Since that

time the President has added an additional $2.00 per barrel import fee (the first in February; the second in June of this year).

"The addition of these fees has had the effect of further increasing the price of imported crude oil to an estimated $14.50 per barrel. Presumably the unregulated domestic price has also increased above $12.00 per barrel in response to the addition of the second dollar fee in June, but it is impossible at this time to measure that increase with any degree of precision.

"Section 301 of the Committee's bill proposes to amend the Emergency Petroleum Allocation Act by adding a new section which incorporates a statutory standard for price regulation of domestic crude oil production.

\* \* \* \* \* \*

"*Statutory Price Ceiling*

"New section 8 of the Emergency Petroleum Allocation Act (15 U.S.C. § 757) proposed to be added by this bill would, therefore, rollback unregulated prices under a formula which yields a per barrel price of approximately $7.50. The President would be permitted to set higher prices for certain additional classifications of oil production." (2 U.S.Code Congressional and Administrative News 1975, pp. 1762, at pages 1799, 1800, and 1804.)

The "rollback" of domestic crude oil (upper-tier) prices mandated by § 757 was accomplished by the President and FEA by executive order and regulations establishing an amended "two-tier" system of price controls effective in February 1976 (41 F.R. 4931) adjusted in March and July 1976, and thereafter in minor respects not significant in the context of this case.

It is uncontroverted that this "rollback" of permissible prices of "upper-tier" domestic crude oil obtainable in the open domestic market resulted in greatly reduced controlled maximum prices for "upper-tier" oil obtainable by plaintiffs and others because of governmental action pursuant to § 757.

This "rollback" of prices of "upper-tier" domestic crude oil is the precise target of plaintiffs' contentions of unconstitutionality under both the Ninth Amendment and later under the Fifth Amendment.

As a factual basis for their constitutional claims and standing to assert them, plaintiffs filed affidavits in support of their motion for summary judgment, stating in part that in reliance on the "two-tier" pricing system existing in law prior to December 15, 1975, each plaintiff invested many millions of dollars in increased drilling and development activities between August 1973 and December 1975 in an effort to increase their crude oil production of upper-tier crude oil (R. 130, 132). No counter affidavits were filed. On these subjects, as distinguished from other subjects, the affidavits in support of the motion of plaintiffs for summary judgment were proper and will be deemed sufficient to establish the facts stated therein for the purposes of that motion.

Neither plaintiff filed any affidavit in support of a motion for summary judgment that the maximum prices of "upper-tier" oil resulted in "serious hardship" as defined by FEA as a basis for administrative relief. In his affidavit, plaintiff Manhart states that he is not in "serious hardship" as defined by FEA. Neither plaintiff has sought any administrative relief in the form of either an exception or exemption for hardship or other reason under 10 C.F.R., Subpart D, § 205.50, *et seq.*, and Subpart E, § 205.70, *et seq.* These regulations provide administrative remedies for affected parties in the form of exceptions or exemptions.

*Decision On Ninth Amendment Question*

The Ninth Amendment to the Constitution of the United States is as follows:

"The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

Plaintiffs seek to secure from this Court a ruling, admittedly without precedent, that there exists a hitherto judicially unrecog-

nized and undefined individual constitutional right under the Ninth Amendment "to trust the federal government and to rely on the integrity of its pronouncements." We find no basis in constitutional history, judicial interpretation, political history, legal scholarship, or persuasive argument to conclude that such a right exists under the Ninth Amendment, or any other provision of the Constitution of the United States. And, if such a constitutional right did exist, it is doubtful that it would be, or could be, applied to render unlawful the "rollback" of "upper-tier" oil prices under § 757, thereby denying to Congress the power to amend the Allocation Act of 1973, by adding § 757.

Admitting that there is no controlling judicial authority in point to support the existence of the claimed Ninth Amendment right, plaintiffs assert that this is a question of first impression. In support of its argument, plaintiffs' counsel cites an exceedingly long, indiscriminate list of federal and state judicial decisions, legal articles, political essays, including some from *The Federalist Papers*, and other sources mentioned above. At oral argument, on request, counsel for plaintiffs selected as the three federal [2] authorities on which plaintiffs would rely, if limited to three citations, the following: *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); and *The Federalist Papers*, Nos. 11, 44, 45, 46, 50, 57, 62, 78, 84, 85.

We have concluded that under the most innovative, creative, and liberal view of the Ninth Amendment concerning unenumerated rights retained by the people, the constitutional right defined by the plaintiffs does not exist. None of the judicial opinions relied on by plaintiffs suggest that such a right exists or ought to exist. By its defini-

tion, the right claimed in this case is based on subjective beliefs of the plaintiffs concerning what the "federal government" has pronounced as "policy."

In our constitutional tripartite system of government, featuring checks and balances between and within the three branches, it is rarely the case, if ever the case, that all branches of the government join in a unanimous, clear statement of policy or meaning of a law that all people unanimously understand and interpret exactly the same way. Frequently, the executive, legislative, and judicial branches disagree about laws and policies. One branch of government acting within its constitutional authority sometimes nullifies or restricts action of another branch.

Popular elections are regularly scheduled by the Constitution and laws of the nation and states as opportunities to change laws, policies, and the principal national officers of the legislative and executive branches of the federal government.[3] If the legislative branch declares a clear policy and enacts a law to implement the policy, it may later change that law and policy if it acts within accepted constitutional limitations. The judicial branch may declare actions of the legislative and executive branches unconstitutional, or interpret such actions contrary to contentions of the officers of the executive or legislative branches.

The right claimed by plaintiffs is not consistent with these accepted constitutional principles. Even subjectively, the plaintiffs had no constitutional or other right to assume that the federal government or any branch thereof represented prior to December 1975, or made a policy that the permissible prices of "upper-tier" oil would never be changed or reduced.

Nothing in the opinion in *Griswold v. Connecticut, supra*, supports the existence of the Ninth Amendment right claimed by

---

**2.** Plaintiffs chose to add the concurring opinion in a state decision holding unconstitutional a local ordinance forbidding presence at a cockfight, deemed interesting but unpersuasive in this action. *State v. Abellano* (1968) 50 Haw. 384, 441 P.2d 333, l.c. 335. The concurring

opinion was unnecessary to the decision, which was based on lack of due process.

**3.** In *Federalist Paper* No. 44, Madison emphasized this remedy as a last resort when the Congress misconstrues the Constitution and exercises unwarranted powers.

plaintiffs. In reaching this conclusion, we acknowledge that the strength and vitality of the Constitution depend on the fact that its principles are adaptable to changing events. And assuming, without declaring, that the concurring opinion of Mr. Justice Goldberg accurately construes the breadth of the Ninth Amendment, nothing in that opinion supports plaintiffs' Ninth Amendment contentions. Even the scholars who approve of, or search for new standards to discover and judicially declare Ninth Amendment rights previously undeclared by any court, fail to support plaintiffs' Ninth Amendment contention. For example, see Towe, *Natural Law And The Ninth Amendment*, 2 Pepperdine Law Review 270, a comprehensive liberal and scholarly exposition, advocating an "ideal scale of values" to declare unenumerated natural rights recognized by the Ninth Amendment; Rhoades & Patula, *The Ninth Amendment: A Survey Of The Theory And Practice In The Federal Courts Since Griswold v. Connecticut*, 50 Denver Law Journal 153, competently reviewing the federal cases since the *Griswold* case; Paust, *Human Rights And The Ninth Amendment: A New Form Of Guarantee*, 60 Cornell Law Review 231, an excellent review of the general principles relied on by plaintiffs and containing a "sketch of discoverable rights."

The law review articles make it clear that a majority of the Supreme Court of the United States has never declared and defined an unenumerated Ninth Amendment constitutional right retained by the people. It is not implausible to argue that the original purposes of the Ninth Amendment have been served by the expanding, liberal judicial interpretations of the rights enumerated in the first eight amendments constituting the principal parts of the Bill of Rights of the Constitution, and of their penumbras, accompanied by their incorporation in the Fourteenth Amendment applicable to states. This is the essence of the reasoning of Mr. Justice Douglas in *Griswold v. Connecticut, supra,* and there is reason to believe that if Mr. Justice Goldberg had accepted the incorporation of the first eight amendments to the Constitution in the Fourteenth Amendment, his special concurring opinion relying on the Ninth Amendment would not have been necessary or desirable.

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 478, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), clearly an application of the First Amendment only, and not in point, is cited by plaintiffs for the proposition that the "right to trust the federal government and rely on its pronouncements is but the mirror image of the First Amendment rights to speech, petition, and knowledge." In support of this proposition, plaintiffs cite a portion of *Keker v. Procunier* (E.D.Cal.1975) 398 F.Supp. 756, l.c. 765, dealing with the Sixth Amendment only. Further, a careful reading of each of *The Federalist Papers*, Nos. 11, 44, 45, 46, 50, 57, 62, 78, 84, and 85, relied on primarily by plaintiffs, fails to reveal any language, express or implied, supporting the existence of the claimed Ninth Amendment right.

Analysis and discussion of the additional host of authorities cited by plaintiffs would be unrewarding. Enough has been written to support our conclusion that the plaintiffs have failed to demonstrate the existence of the asserted Ninth Amendment constitutional right.

A necessary and integral part of plaintiffs' contention that a violation of its claimed Ninth Amendment right is the existence of a reasonable trust or belief by plaintiffs before December 15, 1975, that the federal government would never reduce the permissible prices on "upper-tier" oil; and that neither the Allocation Act of 1973, nor the original regulations thereunder creating the "two-tier" system would ever be amended for that purpose. No such trust or belief was warranted in fact or law. If such trust or belief in fact existed in the minds of plaintiff Manhart and the officers of plaintiff Mapco, it was unreasonable and erroneous so to trust or believe.

In their briefs, plaintiffs do not define precisely the meaning of the word "trust" as used in their description of the claimed

Ninth Amendment right. In the sense that the word "trust" is used by plaintiffs, it has many meanings, ranging from assured reliance or confident expectation, to hope. *Webster's Third New International Dictionary*, G. & C. Merriam Company, 1971, p. 2456; *The Random House Dictionary of the English Language*, Random House, 1967, p. 1521; *The American Heritage Dictionary*, American Heritage Publishing Co., Inc., 1969, p. 1378; Volume I, *The Compact Edition of the Oxford English Dictionary*, Oxford University Press, 1971, p. 3423; *Black's Law Dictionary*, Revised Fourth Edition, West Publishing Company, 1968, p. 1680; *Ballentines' Law Dictionary*, Third Edition, The Lawyers Co-Operative Publishing Company, 1969, p. 1302. All these definitions describe a subjective condition of the individual mind. We recognize that: "A word is not a crystal, transparent and unchanged, it is a skin of living thought and may vary greatly in color and content according to the circumstances ánd time in which it is used," as stated in *Towne v. Eisner*, 245 U.S. 418, l.c. 425, 38 S.Ct. 158, l.c. 159, 62 L.Ed. 372, l.c. 376. Giving to the word "trust" the meanings most favorable to plaintiffs, that of assured reliance or confident expectation, it still describes a subjective condition of individual minds that simultaneously may be absent in some minds, and present in other minds in varying degrees, forms, and substances. This concept of "trust" is not suitable for defining a constitutional right enjoyed by all citizens or persons, however well it may serve in a motto. The same things can be said of the word "rely" as used by plaintiffs.

Further, it is clear that the original regulations containing the "two-tier" system did in fact control prices of all crude oil, including "upper-tier" oil. *Consumers Union of U. S., Inc. v. Sawhill* (Em.App.) 525 F.2d 1068, l.c. 1078. By their very nature, laws and regulations of the federal government are subject to change by lawful means. No law or regulation is immune to change by lawful means and no person can reasonably assume the contrary. And it is clear that Congress, in passing the Allocation Act in 1973, expressly contemplated that those regulations might be required to be modified. *Consumers Union of U. S., Inc. v. Sawhill, supra*, l.c. 1078.

In analogous circumstances in *People of the State of California v. Simon* (Em.App. 1974) 504 F.2d 430, l.c. 437, this Court ruled as follows:

> "Had there been any induced assumption that the exemption would not be removed as a result of the pending rule making proceeding, there still could have been no assurance that by new rule making procedures otherwise initiated, whether retroactive or not, most if not all of the injury the appellees had apprehended would not have occurred anyway. On no theory did appellees have a vested right to continuation of the preferential treatment."

So we conclude that plaintiff had no right under the Ninth Amendment to trust, believe, or rely on the expectation that the maximum prices of upper-tier oil would never be regulated or reduced by the federal government.

## THE FIRST FIFTH AMENDMENT QUESTION

### Plaintiffs' Argument

In their second point, plaintiffs argue that § 757 is unconstitutional on its face because it fails to provide a non-confiscatory standard for price regulation. In this point plaintiffs contend that the current pricing system under the Allocation Act, and § 757 added by the Energy Policy Act, results in the imposition on the crude oil industry of a scheme of comprehensive market regulation of a *permanent* character, but fails to prescribe a mandatory standard for the fixing of "just and reasonable" crude oil prices; and that the action mandated by § 757 contains no mandatory standard for just and reasonable prices.

■ The limitation of the plaintiffs' contention in this respect to facial unconstitutionality avoids possible questions related to failure to exhaust administrative remedies and unconstitutional application to plaintiffs alone. 3 Davis, *Administrative Law*

*Treatise*, Chapter 20, § 20.04 (West Publishing Co. 1958) and pocket part.

If the facial constitutionality of § 757 and regulations issued pursuant thereto were conceded by plaintiffs, then they would be remitted in the first instance to seeking administrative relief from the regulations. 10 C.F.R. Subparts D & E, § 205.50 and § 205.70. *Davis*, op. cit.

Plaintiffs assert that, on this point, this is a "case of first impression," distinguishing *Griffin v. United States* (Em.App.1976) 537 F.2d 1130, as involving old oil and *Condor Operating Co. v. Sawhill* (Em.App.1975) 514 F.2d 351, as involving only the purchaser-supplier freeze rule, and *Consumers Union v. Sawhill* (Em.App.1975) 525 F.2d 1068, as upholding as a temporary measure the upper-tier of the two-tier system under the original Allocation Act of 1973 without the amendments of the Energy Policy Act. Noting that much of the jurisprudence in "permanent" market price control concerns public utilities, the plaintiffs rely primarily upon the *Permian Basin Area Rate Cases*, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312, *reh. den.*, 392 U.S. 917, 88 S.Ct. 2050, 20 L.Ed.2d 1379, involving the Natural Gas Act, 15 U.S.C. § 717 (1968).

In this connection, as stated above, plaintiffs argue that the Allocation Act as amended by § 757 establishes a "*permanent*" scheme of comprehensive market regulation without a required non-confiscatory standard of price control. The fact of permanence is said to be established by the affidavits of Robert E. Thomas, Chief Executive Officer of Mapco, and plaintiff T. A. Manhart, the admissibility and relevance of which is challenged by defendants.

Plaintiffs argue that § 757 of the Allocation Act compels the crude oil producer to serve the public and deprives him of the right to withdraw from the market to avoid regulation, in contrast to the regulations sustained in *Bowles v. Willingham*, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944).

*The First Fifth Amendment Question
Defendants' Argument*

Defendants contend that the *permanence* of the current system on which plaintiffs' arguments are based is conclusively absent, citing the direction to the President "to exercise specific temporary authority . ." 15 U.S.C. § 751(b), and inviting attention to the provision that mandatory crude oil price controls imposed by the Energy Policy Act amendments expire 40 months after enactment of that Act, and that the authority for discretionary controls expires in September 1981. 15 U.S.C. § 760g (Defendants' Br. 17–18).

Second, defendants argue that nothing in the Allocation Act forbids upper-tier crude oil producers from leaving the market, and that the challenged regulatory system applies to an upper-tier producer only if he elects to market crude oil. From these premises defendants argue that the Fifth Amendment does not forbid necessary temporary price and market control decisions, citing *Condor Operating Co. v. Sawhill* (Em. App.1975) 514 F.2d 351, 361; *Cities Service Company v. FEA* (Em.App.1975) 529 F.2d 1016, *cert. den.*, 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184.

Third, defendants assert that the plaintiffs' analogy of the current system to the requirements of the Natural Gas Act has already been rejected by the Temporary Emergency Court of Appeals in *Consumers Union v. Sawhill* (Em.App.1975) 525 F.2d 1068, l.c. 1080.

Fourth, the defendants contend that the Allocation Act does in fact contain crude oil pricing standards which are non-confiscatory under the Fifth Amendment, citing the legislative history of the Act, Section 4(b)(1) of the Allocation Act and the interpretation thereof in *Consumers Union v. Sawhill* (Em. App.1975) 525 F.2d 1068, l.c. 1074.

Finally, defendants argue that there has been no factual showing that either the initial composite price ceiling of $7.66, nor the later composite ceiling of $7.56 is confiscatory, or has caused financial difficulty to either plaintiff, stating that plaintiffs' real complaint is that they have been temporarily denied the continued opportunity to receive the higher crude oil prices set by the

international OPEC cartel. Defendants argue that the contention that this is a denial of a Fifth Amendment right was rejected in *Griffin v. United States* (Em.App.1976) 537 F.2d 1130, l.c. 1139–1140 (Defendants' Br. 21–24); and that plaintiffs are free to escape the consequences of the Energy Act by electing not to sell upper-tier crude oil.

### The First Fifth Amendment Question Plaintiffs' Reply Argument

Plaintiffs reply that freedom to elect not to sell upper-tier oil is an erroneous description of the supplier-purchaser conditions, arguing that, with certain exceptions in which a supplier-purchaser relationship may be terminated, these conditions do not include a unilateral decision by a producer to cease production or to produce crude oil but not sell it. Plaintiffs contend that producers are denied exit from the market by contractual agreements "universally present in the oil and gas industry" requiring production to continue.

### Decision On First Fifth Amendment Question

 Plaintiffs' first Fifth Amendment contention must be denied because it is based on three incorrect premises described below.

First, § 757 is a part of the Allocation Act establishing not comprehensive, pervasive, all inclusive regulation of an industry, but "*temporary* regulation of *some* aspects of an industry, most particularly distribution." *Consumers Union of U. S., Inc. v. Sawhill* (Em.App.1975) 525 F.2d 1068, l.c. 1080. The soundness of this quoted conclusion is apparent from the unequivocal provisions of the Allocation Act which became effective during an energy crisis. As presently amended, the Allocation Act grants authority that expires at midnight September 30, 1981. 15 U.S.C. § 760g. While circumstances may result in a future extension of the time the authority continues, we do not find it necessary or desirable to determine the legality of such possible extension of authority. The self serving, conclusionary affidavits submitted by plaintiffs, and objected to by defendants, are inadmissible and ineffective to establish "permanency." Rule 56(e), F.R.Civ.P.; *Automatic Radio Research, Inc. v. Hazeltine Research, Inc.,* 339 U.S. 827, l.c. 831, 70 S.Ct. 894, l.c. 896, 94 L.Ed. 1312, l.c. 1317 (1950); 6 Moore's *Federal Practice,* § 56.22[1]; 10 Wright and Miller, *Federal Practice and Procedure,* § 2738. While admissible opinion evidence in an affidavit in support of a motion for summary judgment may be considered in exceptional circumstances, inadmissible opinion evidence, irrelevant evidence, and conclusions in an affidavit are not proper and will not be considered. 6 Moore's *Federal Practice,* § 2738. And because, even if admissible, opinion evidence must ordinarily be evaluated by the finder of the facts, an affidavit containing admissible opinion evidence in support of a motion for summary judgment is not conclusive. *Sartor v. Arkansas National Gas Corporation,* 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967 (1944). The affidavits relied on by plaintiffs are not admissible to contradict the clear statutory provisions, and, if admissible, are not persuasive or conclusive.

So, under the current established factual and legal circumstances, cases involving the Natural Gas Act, such as the *Permian Basin Area Rate Cases, supra,* are not applicable as determined in *Consumers Union of U. S., Inc. v. Sawhill* (Em.App.1975), *supra,* 525 F.2d 1068, l.c. 1080. In this connection, we note that no law made by humans is "permanent." At the most, the duration is indefinite and subject to change.

Second, plaintiffs erroneously contend that the Allocation Act, and § 757 added by the Energy Policy Act, deprive the plaintiffs of the right to withdraw from the market. No authority is cited for this contention. Only the effect of unidentified private contractual agreements are mentioned. These agreements, if any, made by plaintiffs were made voluntarily at the risk of the parties and cannot be the basis of a finding of facial unconstitutionality of § 757.

Third, plaintiffs' remaining contentions are untenable under *Bowles v. Willingham,*

321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944), and *Condor Operating Company v. Sawhill* (Em.App.1975), *supra*, 514 F.2d 351, l.c. 359–362. As stated in *Bowles v. Willingham, supra*, "[o]f course, price control, the same as other forms of regulation, may reduce the value of the property regulated. But, as we have pointed out in the Hope Natural Gas Co. case, . . . that does not mean that the regulation is unconstitutional." Further, there has been no unconstitutional taking of plaintiffs' property for public use under the two-tier price controls. *Griffin v. United States* (Em.App.1976) 537 F.2d 1130, l.c. 1139–1140; Cf. *Bowles v. Willingham*, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944).

The first Fifth Amendment question is, therefore, resolved in favor of the defendants.

### THE SECOND FIFTH AMENDMENT QUESTION

*Plaintiffs' Argument*

In their second Fifth Amendment contention, plaintiffs contend that the mandate of § 757 violates the Fifth Amendment because it does not have a real and substantial relation to the legislative object, which is the control of inflation. Plaintiffs rely upon an affidavit of David A. Huettner, Ph.D., an economist, Director of Energy Programs, Center for Economic and Management Research, University of Oklahoma. Dr. Huettner's affidavit (Exhibit B, R. 162–177) consists of an essay containing speculative, inadmissible conclusions and opinions, including the primary opinion that § 757 will have an "extremely small and short lived deflationary impact on oil product prices . . ." (R. 170). The dominant theme of the opinion is that § 757 will reduce oil stock dividend income. In support of this second Fifth Amendment contention, plaintiffs cite only *Nebbia v. New York*, 291 U.S. 502, l.c. 525, 54 S.Ct. 505, l.c. 511, 78 L.Ed. 940, l.c. 949, 950 (1934).

### The Second Fifth Amendment Question Defendants' Argument

Defendants state that, in the district court, plaintiffs conceded that the Congressional decision temporarily to control the price of domestic crude oil for the protection of the economy and security of the United States was a proper legislative purpose under the Fifth Amendment test of the *Nebbia* case (Defendants' Br. 24–25, fn. 1).

Defendants argue that the affidavit of Dr. Huettner, who disagrees with Congressional policy, is speculative, immaterial, and inadmissible, and was subject to the defendants' motion to strike.

Defendants cite the contrary legislative history of the challenged legislation, consisting of the report of the House Committee on Interstate and Foreign Commerce (Defendants' Br. 27–28); FEA production estimates; a series of letters exchanged between Senator Henry M. Jackson and Frank Zarb, Administrator of the FEA, published in the Congressional Record; Presidential action on supplemental import fees imposed by President Ford in 1975 (Defendants' Br. 29–30), and the description of the composite price provisions in the Energy Policy Act by Senator Cannon (Defendants' Br. 30–31). Defendants state that those who disagree with the economic policy chosen by Congress in the Allocation Act have a political remedy in the right to vote.

### The Second Fifth Amendment Question Plaintiffs' Reply Argument

In their reply argument on the second Fifth Amendment issue, plaintiffs briefly reiterate the argument in their original brief and cite no additional authority.

### Decision On The Second Fifth Amendment Question

 The affidavit of Dr. Huettner cannot be considered to establish plaintiffs' factual contention that § 757 has no real and substantial relationship to the legislative object to control inflation in petroleum product prices because it contains conclusionary, speculative, inadmissible evidence, which is also irrelevant. See authorities

cited above concerning affidavits containing opinion evidence in the decision on the first Fifth Amendment question. Further, it is not relevant that in Dr. Huettner's opinion Congress was wrong in its choice of methods. And finally, it is noted that Dr. Huettner's opinion concedes that some deflationary impact will result from § 757, and to this extent fails to support plaintiffs' contention.

The *Nebbia* case, *supra*, involving the Fourteenth Amendment supports the defendants. It holds, in part: "If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary or discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court functus officio." 291 U.S. l.c. 537, 54 S.Ct. l.c. 516, 78 L.Ed. l.c. 957.

It is not necessary to rely on any rebuttable presumption of validity of legislation to support findings of fact that § 757 has a reasonable relation to a proper legislative purpose, and is neither arbitrary or discriminatory. Cf. 16 *Am.Jur.*2d §§ 137, 138, 139, and cases therein cited on the rebuttable presumption of validity. The finding of fact that § 757 has a reasonable relation to the legislative purposes is amply supported by the texts of the Allocation Act and the Energy Policy Act, and legislative histories of these Acts.

The original full text of the Allocation Act is found in 1 *U.S. Code Congressional and Administrative News*, 93rd Congress, First Session, at pages 693 to 702. The supporting legislative history of the Allocation Act appears in 2 *U.S. Code Congressional and Administrative News*, 93rd Congress, First Session, at pages 2582 to 2712. The original full text of the Energy Policy Act is found in 1 *U.S. Code Congressional and Administrative News*, 94th Congress, First Session, at pages 871 to 969. The supporting legislative history of the Energy Policy Act appears in 2 *U.S. Code Congressional and Administrative News*, 94th Congress, First Session, at pages 1762 to 2059.

## CONCLUSIONS

For the foregoing reasons, plaintiffs' motion for summary judgment is denied in respect to each ground on which § 757 is challenged as unconstitutional. Defendants' motion for summary judgment is granted on each of these grounds. It is therefore

ORDERED that judgment be, and it is hereby, entered for defendants on the constitutional issues.

This action is hereby remanded to the United States District Court for the Northern District of Oklahoma for further proceedings consistent with this opinion.